# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MORTGAGE CONNECT DOCUMENT SOLUTIONS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. N23C-01-178 MAA CCLD |
| GREEN INDUSTRIAL DEVELOPMENT GROUP, LLC, | ) ) ) | |
| Defendant. | ) ) | |

Submitted: July 13, 2023
Decided: September 11, 2023

## **MEMORANDUM OPINION**

*Upon Defendant's Motion to Dismiss***:
DENIED.**

Andrew D. Cordo, Esquire (Argued), Kaitlin E. Maloney, Esquire, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware, *Attorneys for Plaintiff*.

Katherine L. Mowery, Esquire, Griffin A. Schoenbaum, Esquire, of RICHARDS, LAYRON & FINGER, P.A., Wilmington, Delaware; Mark T. Josephs, Esquire (Argued), Brian H. Oates, Esquire, Matt M. Johnson, Esquire, of JACKSON WALKER LLP, Dallas, Texas, *Attorneys for Defendant*.

**Adams, J.**

# I. INTRODUCTION

This is a breach of contract action involving a landlord and a tenant for a building in Colorado. The lease agreement between the parties and a work letter attached to it govern this dispute. Per the lease agreement, the landlord and its affiliates planned to improve the inside of the building to the tenant's requirements. The lease agreement contains a tenant allowance of $30.00 per square foot for these improvements. The landlord's improvement estimates, however, exceeded that dollar amount. The lease agreement also contains a provision governing the parties' dealings on the price per square foot, whereby the tenant would accept the price and pay the landlord the amount over the tenant allowance, or the parties would work together to reduce or eliminate the excess cost. The parties engaged in the latter option multiple times, but they could not reach an agreement on price per square foot. Eventually, the landlord sent two notices of default to the tenant. In the second notice, the landlord terminated the lease.

Shortly after termination, the tenant filed this action. The tenant alleges that the landlord breached the lease agreement. The landlord now moves to dismiss the complaint for failure to state a claim. For the reasons set forth below, the Court concludes that the tenant has pled a breach of the lease agreement under Colorado law. Accordingly, the landlord's motion to dismiss the complaint is **DENIED**.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. The Parties

Plaintiff Mortgage Connect Document Solutions, LLC ("MCDS") is a Delaware limited liability company.[2] MCDS is a mortgage service company that engages in document generation, scanning, processing, and printing.[3]

Defendant Green Industrial Development Group, LLC ("Green") is a Delaware limited liability company.[4]

### B. MCDS Seeks a New Commercial Property and the Parties Execute the Lease Agreement.

In the Fall of 2021, MCDS sought a new commercial space for its business.[5] MCDS required a space to "house a document vault, perform[ ] quality control review of loan documents, scan[ ] those documents, and [ ] operate one large Ricoh VC70H high speed ink jet web press."[6] MCDS also required space for offices, conference rooms, and storage.[7]

---

[1] The facts are drawn from the Complaint and the exhibits attached thereto, which includes the Lease Agreement (Ex. A), Green's Second Notice of Default (Ex. B), and MCDS's response to the Second Notice of Default (Ex. C).
[2] Compl. ¶ 8 (D.I. 1).
[3] *Id.*
[4] *Id.* ¶ 9.
[5] *Id.* ¶ 10.
[6] *Id.*
[7] *Id.*

MCDS received a proposal from JAG Logistics, a Green affiliate.[8] Green, through JAG Logistics, offered to lease space to MCDS in Trade Building II at the JAG Logistics Center, located at 26120 E. 68th Avenue, Aurora, Colorado (the "Building").[9] The Building totaled approximately 46,280 rentable square feet.[10] This total breaks down into approximately: (a) 37,180 square feet of unfinished warehouse space on the Building's first floor, and (b) 9,100 square feet of unfinished office space on the Building's mezzanine floor.[11] Representatives for Green and another affiliate, JAGreen Construction Management, LLC ("Green Construction"), visited MCDS at MCDS's place of business before the parties executed any agreement.[12] While there, MCDS explained its operations and plans for the Building to the representatives.[13]

On April 27, 2022, Green and MCDS executed a commercial lease (the "Lease Agreement").[14] The parties simultaneously executed a work letter (the "Work Letter"), attached to the Lease Agreement.[15] The Work Letter is fully integrated and incorporated by reference into the Lease Agreement.[16]

---

[8] *Id.* ¶ 11.
[9] *Id.*
[10] *Id.* ¶ 12; *see also* Compl., Ex. A (the "Lease Agreement") § 1.3.
[11] Compl. ¶ 12; Lease Agreement § 1.3.
[12] Compl. ¶ 13.
[13] *Id.*
[14] *Id.* ¶ 14; *see* Lease Agreement preamble.
[15] Compl. ¶ 14; Lease Agreement, Ex. C (the "Work Letter").
[16] Compl. ¶ 14; Work Letter §§ 8, 11(f). Discussion regarding breach of the Lease Agreement includes breach of the Work Letter.

The Lease Agreement's base rent totaled approximately $4.3 million over a seven-year term.[17]  On May 26, 2022, MCDS paid Green $127,674.86 as "a security deposit and prepaid rent" (the "Deposit").[18]

The Work Letter "sets forth the entire agreement of [MCDS] and [Green] regarding the Landlord Work and Tenant Work."[19]  The Work Letter defines the "Initial Plan" and "Landlord Work."[20]  The Work Letter states that Green will:

> perform certain leasehold improvement work in the [Building] in substantial accordance with the Initial Plan (defined below).  Such work, as described in the Initial Plan and as more fully detailed in the Working Drawings . . . , shall be hereinafter referred to as the "**Landlord Work**."  Within a reasonable period of time after the Effective Date [i.e., April 27, 2022] subject to [MCDS]'s compliance with the Key Milestone schedule attached hereto as **Exhibit C-1** and incorporated herein by reference, [Green] will deliver to [MCDS] the proposed plan for the Landlord Work (the "**Proposed Plan**"). . . . Once approved (or deemed approved) by [MCDS], the Proposed Plan shall be referred to as the "**Initial Plan**."[21]

The "Tenant Allowance" is a contention between the parties.  Section 5 of the Work Letter defines "Tenant Allowance."  Section 5 states that "[MCDS] shall receive from [Green] an allowance (the '**Tenant Allowance**') in an amount equal to Thirty and No/100 ($30.00) per rentable square foot within the [Building].  The Tenant Allowance shall be used solely as a contribution towards payment of the

---

[17] Compl. ¶ 15.
[18] *Id.* ¶ 16.
[19] Work Letter § 11(f).
[20] *Id.* § 1.
[21] *Id.* (emphasis in original); Compl. ¶ 17.

costs of the Landlord Work."[22]   Section 5(b) of the Work Letter contemplates situations where the Landlord Work exceeds the Tenant Allowance.  Section 5(b) states:

> If [Green] determines or is notified that the Landlord Work shall exceed the Tenant Allowance for any reason, [Green] will notify [MCDS] of the same.  [MCDS] will notify [Green] in writing of its election to either (i) authorize [Green] to proceed with the Landlord Work in accordance with the Initial Plan, in which event [MCDS] will be obligated to reimburse [Green] for the amount by which the Landlord Work exceeded the Tenant Allowance (the "**Excess Cost**"), or (ii) cooperate with [Green] to revise the Working Drawings (subject to [Green]'s review and approval) to reduce or eliminate the Excess Cost.  If [MCDS] elects to have the Initial Plan revised [i.e., option (ii)], then upon completion and approval thereof, [Green] will obtain revised pricing and the foregoing procedure will be repeated until the Excess Cost has been eliminated or [MCDS] has agreed to reimburse [Green]. Any delay caused by [MCDS]'s election of option (ii) which exceeds seven (7) days beyond the date of such election shall constitute Tenant Delay.[23]

The parties sometimes refer to Section 5(b) as the "revise-or-consent procedure."

## C. Pricing Issues Arise

Per the Lease Agreement and Work Letter, the parties arrived at a "mutually acceptable" Initial Plan and Working Drawings.[24]  Green and Green Construction, acting as the general contractor, priced the cost of improvements.[25]  It appears

---

[22] Work Letter § 5 (emphasis in original).
[23] *Id.* § 5(b) (emphasis in original).
[24] Compl. ¶ 22.
[25] *Id.* ¶ 23.

MCDS expected a price at or near $30 per rentable square foot.[26] The first set of Working Drawings estimated that the Landlord Work would cost $164.33 per square foot.[27] MCDS refused to accept this cost the day the first set of Working Drawings were presented.[28]

On September 21, 2022, MCDS and Green discussed ideas to reduce or eliminate the Excess Cost.[29] On September 23, 2022, Green sent MCDS a revised proposal for the Landlord Work that totaled $146.10 per square foot[30]—it is unclear from the Complaint, however, whether MCDS explicitly rejected Green's revised proposal in writing.[31] Additionally, Green offered to increase the Tenant Allowance by an additional $2.50 per square foot.[32] Even with this concession, MCDS says it "would have incurred an additional $113.60 per rentable square foot."[33] MCDS "refused to accept this overage."[34]

---

[26] *See id.*

[27] *Id.*

[28] *Id.* ¶ 24.

[29] *Id.* ¶ 25.

[30] *Id.* ¶ 26.

[31] *Compare id.* (noting the revised proposal of $146.10 per square foot), *with id.* ¶ 27 (noting that Green offered to increase the Tenant Allowance by $2.50 per square foot, which would cause MCDS to incur "an additional $113.60 per rentable square foot," and further noting that "MCDS refused to accept this overage"). Based on MCDS's calculations, it appears Paragraphs 26 and 27 are connected: $146.10 per square foot (revised proposal) – [($30 per square foot (Tenant Allowance)) + ($2.50 per square foot (Tenant Allowance increase))] = $113.60 per square foot "overage" that MCDS "refused to accept."

[32] *Id.* ¶ 27.

[33] *Id.*

[34] *Id.*

On September 27 and 28, 2022, the parties further discussed the Landlord Work.[35] They considered changes to the fire alarm system and document vault, among other items.[36] On September 29, 2022, Green made another revised proposal for the Landlord Work that totaled $142.82 per square foot.[37] MCDS rejected that revised proposal the next day.[38]

Between October 6 and 18, 2022, MCDS and Green continued to discuss pricing.[39] Yet, on October 19, 2022, Green sent MCDS a Notice of Default and Tenant Delay (the "First Notice of Default").[40] The First Notice of Default claimed that MCDS failed to respond to the September 23 proposal within five days.[41] The First Notice of Default stated that this failure to respond timely violated Section 1 of the Work Letter and the Key Milestone Schedule attached to the Lease Agreement.[42] The Key Milestone Schedule states that MCDS "shall" review and approve proposed plans, revised proposed plans, and certain working drawings, among other items, "within Five (5) Days after Receipt."[43]

---

[35] *Id.* ¶ 28.
[36] *Id.*
[37] *Id.* ¶ 29.
[38] *Id.* ¶ 30.
[39] *Id.* ¶ 31.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *See* Lease Agreement, Ex. C-1.

The parties maintained contact after the First Notice of Default.[44]  But, on November 7, 2022, Green's CEO emailed MCDS and stated Green would not provide a space consistent with the Initial Plan and Working Drawings.[45]  Later, in November 2022, Green's CEO stated in a conversation with MCDS that Green would not perform the Landlord Work for less than $130 per square foot.[46]

In December 2022, Green proposed a new Initial Plan that reduced the square footage of the Building (the "Second Initial Plan").[47]  The Second Initial Plan contemplated 19,240 square feet.[48]  MCDS considered the Second Initial Plan and discussed it with Green.[49]  MCDS ultimately elected not to proceed with the Second Initial Plan.[50]

On January 3, 2023,[51] Green threatened to sue MCDS for breach of the Lease Agreement.[52]  On January 12, 2023, Green's counsel sent MCDS a Notice of Default, Tenant Delay and Termination of Lease (the "Second Notice of Default").[53]  The Second Notice of Default stated MCDS failed to accept Green's revised

---

[44] Compl. ¶ 32.
[45] *Id.*
[46] *Id.* ¶ 33.
[47] *Id.* ¶ 34.
[48] *Id.*
[49] *Id.* ¶ 35.
[50] *Id.*
[51] MCDS mistakenly states that the events of this paragraph occurred in 2022, but considering the other facts and exhibits attached to the Complaint, it is clear to the Court that MCDS intended these dates to be 2023.  *See* Compl. ¶¶ 36-38.
[52] *Id.* ¶ 36.
[53] *Id.* ¶ 37; *see also id.*, Ex. B (the "Second Notice of Default").

proposals and that failure constituted Tenant Delay under Section 5(b) of the Work Letter.[54] The Second Notice of Default claimed that MCDS's refusal to comply with Section 5(b) of the Work Letter constituted an Event of Default under Section 10[55] of the Work Letter.[56] Under Section 23 of the Lease Agreement, Green elected to terminate the Lease Agreement effective January 12, 2023.[57] The termination was "final."[58]

On January 13, 2023, MCDS's counsel responded with a letter (the "MCDS Letter").[59] The Complaint states that the MCDS Letter indicates MCDS's "willingness to proceed with negotiations if [Green] intended to reduce and/or eliminate the costs of improvements . . . or, alternatively, [MCDS] request[ed] return of the monies deposited with [Green] as anticipated rent and security."[60] The pertinent language of the MCDS Letter states:

> MCDS is not in default of any obligation under the Lease Agreement. MCDS has been willing to cooperate with Green as required by Section 5(b) of the Work Letter, however Green has repeatedly claimed that is

---

[54] Second Notice of Default at 1; Work Letter § 5(b) ("Any delay caused by [MCDS]'s election of option (ii) which exceeds seven (7) days beyond the date of such election shall constitute Tenant Delay.").

[55] Section 10 of the Work Letter is a general default provision. *See* Work Letter § 10 ("Default. The failure by [MCDS] to comply with the provisions of this Work Letter shall constitute an Event of Default by [MCDS] under the Lease [Agreement] and [Green] shall have the benefit of all remedies provided for in the Lease [Agreement]." (underlining in original)).

[56] Second Notice of Default at 1-2; Work Letter § 10.

[57] Second Notice of Default at 2; Lease Agreement § 23.1 (noting that if MCDS breaches the Lease Agreement, Green may terminate the Lease Agreement).

[58] Second Notice of Default at 2.

[59] Compl., Ex. C (the "MCDS Letter").

[60] Compl. ¶ 38.

something it cannot, or will not, do. Given Green's position, MCDS demands the return of the [Deposit] immediately.[61]

MCDS alleges it was not and is not in default of the Lease Agreement or the Work Letter.[62] No Landlord Work has been performed.[63] MCDS has never occupied the Building.[64]

## D. Litigation Ensues

On January 19, 2023, less than a week after the MCDS Letter, MCDS filed this action.[65] The Complaint asserts one cause of action: breach of the Lease Agreement against Green for (a) not performing the Landlord Work, (b) delivering the First Notice of Default and the Second Notice of Default when MCDS was not in default, and (c) refusing to return the Deposit after purporting to terminate the Lease Agreement.[66]

On March 22, 2023, Green filed its current Motion to Dismiss the Complaint for failure to state a claim (the "Motion").[67] MCDS opposes the Motion.[68] The Court heard oral argument on July 13, 2023, and reserved decision.[69]

---

[61] MCDS Letter.
[62] Compl. ¶ 39.
[63] *Id.* ¶ 40.
[64] *Id.*
[65] *See generally id.* (having a filing date of January 19, 2023).
[66] *Id.* ¶¶ 41-45.
[67] *See* Defendant's Motion to Dismiss (the "Motion") (D.I. 16).
[68] *See* Plaintiff's Answering Brief ("Answering Br.") (D.I. 22).
[69] Judicial Action Form (D.I. 30).

## III. STANDARD OF REVIEW[70]

When considering a motion to dismiss pursuant to Superior Court Civil Rule 12(b)(6), the Court must:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claim] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[71]

The pleading standard in Delaware is "minimal,"[72] but the liberal construction afforded to the non-moving party does "not extend to 'conclusory allegations that lack specific supporting factual allegations.'"[73] "Accordingly, the Court will dismiss a complaint [1] if the plaintiff fails to plead specific allegations supporting each element of a claim or [2] if no reasonable interpretation of the alleged facts reveals a remediable injury."[74] Green states that it is moving to dismiss the Complaint under the latter ground.[75]

---

[70] The Lease Agreement contains a "Governing Law" provision stating that the Lease Agreement is to be construed under Colorado law. *See* Lease Agreement § 43. Delaware courts generally apply Delaware procedural law and the substantive law of the foreign state that governs the cause of action. *See US Dominion, Inc. v. Fox News Network, LLC*, 2021 WL 5984265, at *18 (Del. Super. Dec. 16, 2021) (citing Restatement (Second) of Conflict of Laws § 122 (2023) ("A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case.")).

[71] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[72] *Id.* at 536.

[73] *Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *6 (Del. Super. Jan. 13, 2021) (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[74] *Axogen Corp. v. Integra LifeSciences Corp.*, 2021 WL 5903306, at *2 (Del. Super. Dec. 13, 2021) (citing *Surf's Up Legacy P'rs, LLC*, 2021 WL 117036, at *6).

[75] Motion at 8.

Generally, the complaint "defines the universe of facts" that the Court can consider on a motion under Rule 12(b)(6).[76] Even so, the Court "may consider documents outside the pleadings when 'the document is integral to a plaintiff's claim and incorporated into the complaint.'"[77] The Complaint incorporates three exhibits attached to it; the parties do not dispute that the Court can rely on these exhibits.[78]

## IV. ANALYSIS

Colorado law governs this dispute.[79] To state a claim for breach of contract under Colorado law, the plaintiff must establish: "(1) the existence of a contract; (2) performance under the contract by the plaintiff or some justification for nonperformance; (3) the defendant's failure to perform under the contract; and (4) resulting damages to the plaintiff."[80]

MCDS alleges in its Complaint that it performed under the Lease Agreement[81] by continually engaging in the revise-or-consent procedure with Green until Green terminated the Lease Agreement via the Second Notice of Default.[82] Green disputes

---

[76] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citation omitted).

[77] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[78] *See* Motion at 12-14 (citing Complaint exhibits); Answering Br. at 2-3, 10 (same).

[79] Lease Agreement § 43 ("This Lease [Agreement] shall be construed in accordance with the laws of the State of Colorado."); Work Letter § 11(a) ("This Work Letter shall be governed by Colorado law.").

[80] *Hemmann Mgmt. Servs. v. Mediacell, Inc.*, 176 P.3d 856, 859 (Colo. App. 2007) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).

[81] The Lease Agreement is a valid and enforceable contract. The parties do not dispute this.

[82] *See* Compl. ¶¶ 22-35.

that MCDS performed.[83]  Green argues that the Second Notice of Default was premised on MCDS's failure to perform.  Namely, the Second Notice of Default states that on December 28, 2022, MCDS notified Green of its disapproval with a proposal and MCDS's "refusal" to proceed with the Lease Agreement.[84]  The Complaint, on the other hand, paints a different picture: MCDS continually engaged in the revise-or-consent procedure with Green.[85]  Taking the well pleaded factual allegations in the Complaint as true and drawing all reasonable inferences in MCDS's favor,[86] it is reasonably conceivable that MCDS performed under the Lease Agreement.[87]

The Complaint alleges Green breached the Lease Agreement by failing to engage in the revise-or-consent procedure with MCDS.  Specifically, the Complaint alleges that on November 7, 2022, Green's CEO emailed MCDS and stated that Green refused to provide space consistent with the Initial Plan and Working Drawings.[88]  Additionally, the Complaint alleges Green improperly sent the Second

---

[83] Motion at 2, 6.

[84] *See* Second Notice of Default at 2.

[85] *See* Compl. ¶¶ 22-35.  Green argues that MCDS never notified Green in writing, pursuant to Section 5(b) of the Work Letter, that MCDS intended to cooperate in the revise-or-consent procedure after MCDS did not accept an Initial Plan sent by Green on September 23, 2022.  *See* Defendant's Reply Brief ("Reply Br.") at 4 (D.I. 24).  The Complaint is unclear on this point.  *See* Compl. ¶¶ 26-27.  At this stage, the Court must accept the Complaint's well pleaded allegations as true and draw all reasonable inferences in favor of MCDS.  *See Cent. Mortg. Co.*, 27 A.3d at 535.

[86] *Cent. Mortg. Co.*, 27 A.3d at 535.

[87] *See id.* at 537 ("[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" (citation omitted)).

[88] Compl. ¶ 32.

13

Notice of Default and terminated the Lease Agreement, thereby refusing to engage in the revise-or-consent procedure with MCDS.[89] Work Letter Section 5(b) states that if MCDS elects to have the Initial Plan revised, Green "will obtain revised pricing and [the revise-or-consent] procedure will be repeated until the Excess Cost has been eliminated or [MCDS] has agreed to reimburse [Green]."[90] The language of Section 5(b) is mandatory, i.e., Green "will obtain revised pricing," and the parties will continue to engage in the revise-or-consent procedure. The Complaint alleges that Green refused to engage and sent the Second Notice of Default. Given the lenient pleading standard on a motion to dismiss, the Complaint adequately alleges that Green failed to perform under the Lease Agreement and Working Letter.

The Complaint adequately pleads damages. Green contends that, even if a breached occurred, MCDS would receive the benefit of a continued lease, not the monetary damages MCDS seeks in the Complaint.[91] At the motion to dismiss stage, however, if MCDS states a cognizable claim, "then 'the nature of that relief is not relevant and need not be addressed.'"[92] While it is true that, at some point, MCDS

---

[89] *Id.* ¶¶ 37, 42-43.

[90] Work Letter § 5(b).

[91] Reply Br. at 11-12.

[92] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 991 (Del. Ch. 2000) (quoting *Chaffin v. GNI Grp., Inc.*, 1999 WL 721569, at *7 (Del. Ch. Sept. 3, 1999)). While *Crescent/Mach I Partners* is a Delaware case, and Colorado law governs the Lease Agreement, Green acknowledges that there is no outcome-determinative difference between the laws of Colorado and Delaware for its Motion. *See* Motion at 9 n.6 ("Practically, the distinction of substantive and procedural law applies only if the difference between Delaware and Colorado law is outcome determinative. . . . Here, the difference is not outcome determinative.").

will need to choose a remedy,[93] it is unnecessary to determine the proper measure of damages at the motion to dismiss stage. Therefore, MCDS adequately pleads damages at this stage.

## V. CONCLUSION

Whether MCDS can ultimately prove that Green breached the Lease Agreement is for another day. Given that the parties have not yet had the opportunity to take discovery, and given that Delaware's 12(b)(6) standard requires the Court to draw all reasonable factual inferences in favor of MCDS, the Court concludes that MCDS has adequately pleaded a breach of contract claim under Colorado law.[94] Accordingly, Green's Motion is **DENIED**.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

---

[93] *See Air Sols., Inc. v. Spivey*, 529 P.3d 644, 678 (Colo. App. 2023) (Schutz, J., concurring in part and dissenting in part) (holding that on a claim for breach of contract, the claimant was entitled to pursue either the remedy of rescission or affirm the contract and pursue the damages caused by the breach, but that claimant "was not entitled to both the return of his investment and the benefit of the bargain").

[94] *Hemmann Mgmt. Servs.*, 176 P.3d at 860 ("[T]he complaint adequately sets forth the [breach] that is the subject of [MCDS's] contract claim[] and provides [Green] with sufficient notice of the claim[] asserted against it.").

15