## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARI GREENBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0388-BWD |
| | ) | |
| BCV SOCIAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## FINAL REPORT

Final Report:  November 20, 2023
Date Submitted:  November 7, 2023

Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; OF COUNSEL: Jordan A. Finfer, PATZIK, FRANK & SMOTNY LTD., Chicago, Illinois, *Attorneys for Plaintiff Ari Greenberg.*

Travis S. Hunter and Nathalie A. Freeman, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Jeffrey J. Mayer and Catherine A. Miller, AKERMAN LLP, Chicago, Illinois, *Attorneys for Defendant BCV Social, LLC.*

**DAVID, M.**

The plaintiff in this action, Ari Greenberg ("Plaintiff"), seeks reformation of an employment agreement negotiated in connection with non-party RateGain Travel Technologies Pvt. Ltd.'s ("RateGain") acquisition of defendant BCV Social, LLC ("BCV") in 2019. As part of that transaction, Plaintiff—a founder and former executive of BCV—negotiated the terms of his continued employment with the surviving entity. Plaintiff's Verified Complaint (the "Complaint") alleges that during a May 10, 2019 dinner meeting, RateGain's CFO agreed that following the merger closing, as a condition of Plaintiff's continued employment, Plaintiff would receive stock options that "would vest within [a] mandatory employment period"— in other words, by the earliest date on which BCV could terminate Plaintiff without cause. Verified Compl. For Breach Of Contract [hereinafter, "Compl."] ¶¶ 12-14, Dkt. 1. At the merger closing, Plaintiff executed two agreements: (1) an employment agreement with BCV, which permitted BCV to terminate Plaintiff for "non-performance" no earlier than June 1, 2020; and (2) a stock option agreement with RateGain, which provided that Plaintiff's stock options would vest on the first anniversary of the grant date, provided that Plaintiff remained employed by BCV through that date.

According to the Complaint, the parties expected the merger to close on June 1, 2019. If it had, Plaintiff's stock options would have vested one year later, on June 1, 2020—the earliest date BCV could terminate Plaintiff for non-performance.

1

Instead, the merger closed ten days later than anticipated, pushing the grant date to June 11, 2019. The following March, BCV notified Plaintiff of its intent to terminate him effective June 1, 2020—ten days before his options would have vested. Through this action, Plaintiff seeks to reform the employment agreement to reflect the parties' alleged prior understanding that BCV could not terminate him for non-performance until June 11, 2020, the date his options would have vested.

BCV has moved to dismiss the Complaint for failure to state a claim. For the reasons discussed below, I recommend that the motion to dismiss be denied as to Plaintiff's request for reformation, but granted as to Plaintiff's related claim for breach of contract. This is a final report.

## I. BACKGROUND

The following facts are drawn from the Complaint and the documents it incorporates by reference, including a June 11, 2019 employment offer letter (the "Employment Agreement") and a June 11, 2019 Employee Stock Option Agreement (the "Stock Option Agreement").[1]

---

[1] *See Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]") (citation omitted).

The Employment Agreement is attached to the Complaint as Exhibit A. The Stock Option Agreement is attached to the Complaint as Exhibit B.

## A. RateGain Agrees To Acquire BCV And Plaintiff Negotiates His Continued Employment With The Surviving Entity.

In 2009, Plaintiff Ari Greenberg and non-party Benji Greenberg founded BCV, a Delaware limited liability company engaged in social media marketing for the hospitality industry. Compl. ¶¶ 5, 10. Benji Greenberg served as BCV's CEO, and Plaintiff served as President. Compl. ¶ 1.

In June 2019, non-party RateGain acquired BCV in a merger through which RateGain Merger LLC, a wholly owned subsidiary of RateGain, merged with BCV (the "Merger"). Compl. ¶ 1. The Complaint alleges that in the months leading up to the Merger, Plaintiff negotiated the terms of his post-merger employment with RateGain's CFO, Tanmaya Das. Compl. ¶ 11. Specifically, the Complaint alleges that on May 10, 2019, Plaintiff, Benji Greenberg, and Das met for dinner, during which Das agreed that, as a condition of Plaintiff's continued employment, RateGain would grant Plaintiff options to purchase 1,000 shares of RateGain common stock, "which would vest within [a] mandatory employment period." Compl. ¶¶ 12-13. In other words, Plaintiff's "options in RateGain would vest, at the earliest, conterminously with the earliest termination date of his employment." Compl. ¶ 14.

According to the Complaint, BCV and RateGain initially anticipated that the Merger would close on June 1, 2019. Compl. ¶ 24. However, "due to last minute changes" in the transaction documents, the Merger closed ten days later than expected, on June 11, 2019. Compl. ¶ 24.

## B. The Employment Agreement

Concurrently with the closing of the Merger, on June 11, 2019, Plaintiff and BCV executed an Employment Agreement in the form of an "offer letter," pursuant to which Plaintiff would become BCV's "Head of Global Growth." Compl., Ex. 1 at 1. The Employment Agreement contemplates that, in addition to receiving a base salary, Plaintiff would be eligible for an annual bonus based on BCV achieving EBITDA targets, benefits made available to "C" level management, and vacation time, and also would receive "options to purchase **[1,000]** shares of [RateGain] under [a] grant agreement . . . ." Compl. Ex. 1 at 2.

> The Employment Agreement states that:
>
> [T]he Company can terminate [Plaintiff's] employment on the grounds of Cause and Non Performance and [Plaintiff] shall be relieved of all of [his] obligations (other than as set forth on Exhibit C). In case of Non Performance, the company is obliged to provide two (2) months notice. . . . For the purpose of this Agreement "Non Performance" shall mean *at any time following March 31, 2020* if the company's EBIDTA is less than (i) 70% of the EBIDTA target set forth for the 3 month period ending March 31, 2020 or (ii) 80% of the EBIDTA target for any fiscal quarter set forth as part of a Plan for a period thereafter.

Compl., Ex. 1 at 1-2 (emphasis added).

Accordingly, the earliest date on which BCV could terminate Plaintiff for Non Performance was June 1, 2020, *i.e.*, two months after the first date following March 31, 2020. Plaintiff avers that the June 1 date was a function of the original anticipated merger closing, and that the parties "mistakenly failed to modify

4

[Plaintiff's] Employment Agreement to reflect the new closing date . . . ." Compl. ¶ 25.

### C.	The Stock Option Agreement

Also concurrent with the Merger closing, on June 11, 2019, Plaintiff and RateGain entered into a Stock Option Agreement. Compl., Ex. 2. The Stock Option Agreement provides that Plaintiff's "1,000 Employee Stock Options shall vest on the first (1st) anniversary of the [June 11, 2019] Grant Date, provided that [Plaintiff] remains continuously employed by or providing services to the Company or one of its subsidiaries between the Grant Date and such first (1st) anniversary of the Grant Date." Compl., Ex. 2 ¶ 4.2.

Accordingly, the earliest date on which Plaintiff's 1,000 stock options could vest was June 11, 2020, *i.e.*, the first anniversary of the June 11, 2019 Grant Date.

### D.	BCV Terminates Plaintiff's Employment Before His Stock Options Vest.

On March 27, 2020, Plaintiff received written notice from Das that, "[p]ursuant to the [Employment Agreement], BCV w[ould] exercise its right to terminate [Plaintiff's] employment for Non-Performance, as defined therein, on April 1, 2020." Compl., Ex. 3. Because the Employment Agreement required that BCV give Plaintiff two months' notice prior to his termination, the effective date of his termination was June 1, 2020. Compl., Ex. 1 at 1; *see also* Compl., Ex. 3.

Because Plaintiff was no longer employed by BCV on June 11, 2020, Plaintiff's 1,000 stock options did not vest under the Stock Option Agreement.

### E.    Plaintiff Files Suit.

More than three years after receiving notice of BCV's intent to terminate him, on March 31, 2023, Plaintiff initiated this action through the filing of the Complaint, which alleges two counts: Count I, seeking reformation of the Employment Agreement, and Count II, asserting a claim for breach of the Employment Agreement.  Compl. ¶¶ 22-35.

On May 15, 2023, BCV moved to dismiss the Complaint (the "Motion").  Dkt. 4.  On June 20, 2023, BCV filed its Opening Brief in Support of its Motion to Dismiss.  Def. BCV Social, LLC's Op. Br. In Supp. Of Its Mot. To Dismiss [hereinafter, "OB"], Dkt. 7.  On August 1, 2023, Plaintiff filed his Answering Brief in Opposition to BCV Social LLC's Motion To Dismiss.  Ari Greenberg's Ans. Br. In Opp'n To BCV Social LLC's Mot. To Dismiss [hereinafter, "AB"], Dkt. 11.  On September 1, 2023, BCV filed a Reply Brief in Support of its Motion to Dismiss. Def. BCV Social, LLC's Reply Br. In Supp. Of Its Mot. To Dismiss [hereinafter, "RB"], Dkt. 13.

I heard oral argument on the Motion on November 7, 2023.

6

## II.   ANALYSIS

BCV has moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party . . . ."  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).  "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"  *Id*. at 537.

### A.   The Complaint Pleads A Viable Request For Reformation In Count I.

In Count I, Plaintiff seeks to reform the Employment Agreement to conform to the parties' alleged prior understanding that BCV could not terminate Plaintiff for Non Performance before June 11, 2020, the day his stock options would have vested.

"Reformation is an equitable remedy which emanates from the maxim that equity treats that as done which ought to have been done."  *Obsidian Fin. Gp., LLC v. Identity Theft Guard Sols., Inc.*, 2021 WL 1578201, at *10 (Del. Ch. Apr. 22, 2021) (citation and internal quotation marks omitted).  "Reformation does not . . . provide the Court 'equitable license . . . to write a new contract at the invitation of a party who is unsatisfied with his or her side of the bargain; rather, it permits the

7

Court to reform a written contract that was intended to memorialize, but fails to comport with, the parties' prior agreement.'" *Id.* (ellipses in original) (citation omitted).

A party seeking reformation must plead the following:

(i) that the parties reached a definite agreement before executing the final contract; (ii) that the final contract failed to incorporate the terms of the agreement; (iii) that the parties were similarly mistaken or that [one] knew of [another's] mistake and remained silent; and (iv) the precise mistake the parties made.

*AECOM v. SCCI Nat'l Hldgs., Inc.*, 2023 WL 6294985, at *6 (Del. Ch. Sept. 27, 2023) (alterations in original) (footnotes and internal quotation marks omitted). These elements must be pled with particularity in accordance with Court of Chancery Rule 9(b). *See Joyce v. RCN Corp.*, 2003 WL 21517864, at *3 (Del. Ch. July 1, 2003) ("Rule 9(b) requires that 'in all averments of . . . mistake, the circumstances constituting . . . [the] mistake shall be stated with particularity.'") (alteration and ellipses in original) (citation omitted). "The Rule 9(b) heightened pleading standard is intended to serve the purpose of giving notice of the claimed ground or mistake to the defendant, as well as to preserve the integrity of written agreements by making it difficult to re-open completed transactions." *Id.*

The Complaint here sufficiently alleges facts that, if true, meet the elements for entitlement to reformation. First, the Complaint adequately alleges that the parties came to a mutual understanding prior to executing the Employment

8

Agreement. The Complaint alleges that, "[p]rior to entering into the Employment Agreement, [Plaintiff] and BCV and RateGain agreed and guaranteed that [Plaintiff]'s options would vest and both parties intended to draft the Employment Agreement with this intent." Compl. ¶ 23. More specifically, Plaintiff avers that on May 10, 2019, at a dinner meeting between Plaintiff, Benji Greenberg, and Das, the parties agreed that RateGain would grant Plaintiff options to purchase 1,000 shares of RateGain common stock "which would vest within [a] mandatory employment period." Compl. ¶¶ 12-13. BCV points out that "mandatory employment period" is not defined in the Employment Agreement. *See* OB at 6. In my view, though, Plaintiff's pleading makes his position sufficiently clear—he alleges the parties reached a prior understanding that BCV could not terminate Plaintiff without cause prior to the date on which his stock options would vest.[2]

---

[2] BCV asserts that even if Plaintiff and *RateGain* (through Das) reached a prior understanding before the Merger closed, *BCV* did not have that same "understanding" because Das could not speak for BCV until after the Merger closed. OB at 10; RB at 5-6. This argument is too cute by half. The Complaint alleges that Das negotiated for RateGain in a transaction through which RateGain acquired BCV. Compl. ¶ 13. At closing, Das signed the Employment Agreement on behalf of BCV. Compl., Ex. 1 at 3. The corporation had no "understanding" other than through its principals—if Das had an understanding with Plaintiff, it can, at the pleadings stage, be fairly attributed to BCV. *See N. Assur. Co. v. Rachlin Clothes Shop*, 125 A. 184, 188 (Del. 1924) ("A corporation being a purely metaphysical creature, having no mind with which to think, no will with which to determine and no voice with which to speak, must depend upon the faculties of natural persons to determine for it its policies and direct the agencies through which they are to be effectuated.").

Second, the Complaint adequately alleges that the Employment Agreement failed to incorporate the terms of the parties' prior mutual understanding. The Complaint alleges that "the Employment Agreement between BCV and [Plaintiff] was intended to guarant[ee] twelve months of employment"; "RateGain and [Plaintiff] intended to structure [Plaintiff's] employment agreement such that his options in RateGain would vest, at the earliest, conterminously with the earliest termination date of his employment"; but, "[d]ue to an oversight by the parties, they mistakenly failed to modify [Plaintiff]'s Employment Agreement to reflect the new closing date [after the Merger closing was postponed] such that [Plaintiff's] options would be guaranteed to vest." Compl. ¶¶ 2, 14, 25. As a result, the Employment Agreement, as written, permits BCV to terminate Plaintiff for Non Performance effective June 1, 2020—on the one-year anniversary of the planned Merger closing, but ten days before the one-year anniversary of the actual Merger closing and stock option Grant Date. *See* Compl., Ex. 1.

Third, the Complaint adequately alleges that the parties were mutually mistaken about the terms of the Employment Agreement. The Complaint alleges that "[b]oth RateGain (inclusive of its wholly-owned subsidiary, BCV) and [Plaintiff] intended that the Non-Performance definition should have been written in such a manner that [Plaintiff]'s termination could not be effective until June 11, [2020], such that his options in RateGain would have vested prior to his termination

10

of employment with BCV." Compl. ¶ 18. Despite the parties' mutual belief that this had been accomplished, due to a drafting oversight, it had not. Compl. ¶¶ 25-26.

And fourth, the Complaint makes plain the effect of the error—if the Employment Agreement had included a termination date ten days later, Plaintiff would have remained employed with BCV on the one-year anniversary of the Merger closing, and his stock options would have vested under the Stock Option Agreement. Compl. ¶ 3.

BCV raises several arguments that it contends defeat Plaintiff's request for reformation "as a matter of law." OB at 11. These arguments do not require dismissal of Plaintiff's reformation count at this stage.

First, BCV cites *Obsidian Financial Group, LLC v. Identity Theft Guard Solutions, Inc.*, to argue that "Delaware law . . . does not support simply rewriting deadlines on the grounds of alleged mistake when precise deadlines are at issue." OB at 10. BCV's reliance on *Obsidian* here is misplaced. In that case, a plaintiff seeking to reform a merger agreement "fix[ed] its theory of reformation on the parties' mistaken belief" that a government contract would be extended for six years. *Obsidian Fin. Gp., LLC*, 2021 WL 1578201, at *10. It later turned out that the contract was terminated after five years and six months. *Id.* The plaintiff argued that, had the parties known and understood the effect of a particular regulation on

11

the duration of that contract, they would have drafted an earnout provision differently. *Id.* As the Court explained, the plaintiff did *not* allege "particularized facts detailing a 'specific prior understanding'" between the parties, and the complaint therefore failed to adequately allege entitlement to reformation. *Id.* By contrast, here, the Complaint alleges that Plaintiff and BCV actually agreed to an arrangement that differs from what ultimately was reflected in the Employment Agreement.[3]

Next, BCV argues that the Complaint fails to allege the precise "contract language to which [Plaintiff] and BCV supposedly agreed, or identify the language in the Employment Agreement . . . that needs to be changed to match the language that the parties allegedly agreed should be included in the [Employment Agreement]." RB at 2. In *Joyce v. RCN Corporation*, Justice Jacobs, sitting by designation as Vice Chancellor, rejected a similar argument. There, the Court declined to dismiss a complaint seeking reformation of a merger agreement where "[t]he plaintiff claim[ed] that as a result of a mutual mistake, the Agreement

---

[3] *Compare AECOM*, 2023 WL 6294985, at *7 (dismissing reformation count where plaintiff's theory was not premised on "any actual agreement between the parties"), *and In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *2 (Del. Ch. Oct. 20, 2015) (dismissing reformation count where "plaintiff . . . failed to allege facts demonstrating the existence of an antecedent agreement between [the parties] inconsistent with the price term of the merger agreement"), *with Joyce*, 2003 WL 21517864, at *6 (sustaining reformation count where "the complaint clearly state[d] the terms of the parties' alleged oral agreement").

12

incorrectly stated the consideration that was to be paid to the shareholders of the acquired company." *Joyce*, 2003 WL 21517864, at *1. Specifically, the merger parties agreed that the buyer would place stock in escrow for one year to secure certain indemnity rights. According to the complaint, the merger parties "bargained for th[os]e escrowed funds to be converted into [the buyer's] common shares, in a quantity that would be determined under a formula based upon [the buyer]'s average stock price for the fifteen days preceding the expiration of the indemnity claims period . . . ." *Id.* However, the escrow provision in the merger agreement omitted that fifteen-day formula. The seller's stockholder representative sued, seeking reformation of the merger agreement, and the buyer moved to dismiss, arguing, among other things, that the complaint failed to "identify each section of the Agreement that [wa]s affected by the mistake, and . . . inform the Court of the correct terms that must be inserted in each affected provision." *Id.* at *6. Rejecting that argument, the Court explained:

> The complaint does not enumerate each and every section of the Agreement that is implicated by the alleged error, but that omission likewise is not fatal, because the complaint alleges the specific transaction—and the mistake—in sufficient detail to enable the defendant to investigate and make that determination itself. Although the plaintiff may have been sloppy in not identifying the Agreement's escrow provision by section number, the omission is immaterial because the Agreement identifies that provision as "Section 2.1(l) Escrow of Shares." Although common sense dictates the inference that certain other sections or documents that track or are inconsistent with the mistaken language may have to be reformed if the plaintiffs can prove their claim, [defendant] cites ***no authority that requires the***

13

> ***plaintiff, at this stage of the proceedings***, to provide a laundry list of all sections that may be implicated by the reformation claim, or ***to propose precise language that should be substituted for those sections***.

*Id.* (emphasis added).

Here, the Complaint sufficiently alleges a prior understanding between the parties—BCV could not terminate Plaintiff without cause prior to the date on which his stock options would vest. Although the Complaint does not allege the precise contract language to which the parties agreed,[4] "the complaint alleges the specific transaction—and the mistake—in sufficient detail to enable the defendant to investigate" and determine for itself what language must reformed to reflect the parties' intentions.[5] *Id.*

---

[4] The Court is not really "left to guess as to what contractual terms should fill the void," as BCV asserts. RB at 4. One obvious possibility for reconciling the difference between the alleged prior understanding and the express terms of the Employment Agreement would be to reform the definition of Non Performance as follows: "For the purpose of this Agreement 'Non Performance' shall mean at any time following ~~March 31, 2020~~ **April 10, 2020** . . . ."

[5] BCV urges that the facts in *Richard B. Gamberg 2007 Family Trust v. United Restaurant Group, L.P.*, are more analogous to those pled here. 2018 WL 566417 (Del. Ch. Jan. 26, 2018). In that case, the plaintiff, a limited partner of a limited liability company, sought reformation of a partnership agreement requiring that any excess distributions in a given year be treated as prepayment in later years. The plaintiff argued that those prepayment terms were the result of a scrivener's error because the general partner who signed the agreement "did not know or realize the offending provision . . . was included in the . . . Agreement." *Id.* at *5. In rejecting this argument, the Court noted that the "Plaintiff only allege[d] what [the general partner] believed the underlying agreement was *not*, as opposed to what positive agreement [the general partner] intended to govern distributions." *Id.* at *6. By contrast, here, Plaintiff alleges a specific prior understanding between the parties that was not accurately reflected in the Employment Agreement.

Additionally, BCV contends that two provisions in the Stock Option Agreement bar Plaintiff's request for reformation: (1) the Stock Option Agreement contains an integration clause;[6] and (2) the Stock Option Agreement requires that BCV's "Compensation and Benefits Committee shall determine all questions of interpretation concerning this Agreement."  Compl., Ex. 2 ¶ 3.  These arguments miss the mark.  Plaintiff does not seek to reform or interpret the Stock Option Agreement—that agreement is clear that Plaintiff's stock options would vest on the first anniversary of the Grant Date, provided Plaintiff remained employed by BCV on that date.  *Id.* ¶ 4.2.  The question raised by Plaintiff's request for reformation is not when the stock options would vest, but whether the parties intended to permit BCV to terminate Plaintiff for Non Performance before that date.[7]

---

[6] The integration clause in the Stock Option Agreement provides that "[t]his Agreement and the [RateGain Employee Stock Option Scheme (2018) (the 'Plan')] constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Option Grantee with respect to the subject matter hereof . . . ."  Compl., Ex. 2 ¶ 2.  The Employment Agreement does not contain similar language.  *See* Compl., Ex. 1.

[7] Similarly, BCV suggests that "[t]he overall content of the Employment Agreement and the Plan (which is incorporated into the Stock Agreement) . . . refute the idea that the parties intended to reward poor performance or move any dates."  OB at 13.  That argument does not address whether the parties intended to permit BCV to terminate Plaintiff for Non Performance as of June 1, 2020, or as of June 11, 2020.  If BCV means to argue that BCV would not have agreed to guarantee that Plaintiff's stock options would vest because doing so would be inconsistent with the Plan's purpose, this raises a fact dispute contrary to Plaintiff's well-pled allegations that cannot be resolved on the Motion.

15

Finally, BCV argues that Plaintiff's failure to seek reformation sooner "is a dispositive fact here." RB at 13. The Employment Agreement was signed on June 11, 2019. Compl., Ex. 1. On March 27, 2020, Plaintiff received notice of BCV's intent to terminate him. Compl., Ex. 3. The termination became effective on June 1, 2020. *Id*. Plaintiff then waited nearly three years, until March 31, 2023, to file the Complaint. According to BCV, based on that timing, "it is simply not reasonably conceivable that [Plaintiff] would be able to establish each of the elements of reformation by clear and convincing evidence, and the Court can rule as a matter of law that he can never meet that burden." RB at 14. While the timing is odd, at this stage, Plaintiff is entitled to the benefit of all reasonable inferences based on the well-pled facts in his Complaint. As such, it is reasonably conceivable that reformation is appropriate, for all the reasons explained above.

\*          \*          \*

As explained above, the Complaint adequately pleads entitlement to reformation. Accordingly, I recommend that the Motion be denied as to Count I.

### B. The Complaint Fails To State A Claim For Breach Of Contract In Count II.

In Count II, Plaintiff alleges that BCV breached the Employment Agreement. According to Plaintiff, "BCV attempted to prematurely terminate" Plaintiff by sending a notice of termination on March 27, 2020, even though, under the Employment Agreement, "BCV could only give notice of its intent to terminate his

16

employment for non-performance after March 31, 2020, given that performance was tied to financial results and the fiscal quarter needed to close." AB at 11-12.

"The statute of limitations at 10 *Del. C.* § 8106 requires a plaintiff to bring a breach of contract claim within three years of the accrual of the cause of action." *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476, at *7 (Del. Ch. Aug. 22, 2016). "A cause of action for breach of contract accrues 'at the time the contract is broken, not at the time when actual damage results or is ascertained.'" *Brown v. Ct. Square Cap. Mgmt., L.P.*, 2022 WL 841138, at *2 (Del. Ch. Mar. 22, 2022) (citation omitted).

Plaintiff alleges that BCV breached the Employment Agreement when it sent the notice of termination on March 27, 2020. The Complaint was filed more than three years later, on March 31, 2023. Plaintiff's breach of contract claim is time-barred.

Plaintiff asserts that BCV waived its statute of limitations defense by raising the argument for the first time in its reply brief. I disagree. The orderly administration of justice requires parties to brief their positions so that their opponents, and the Court, have a fair opportunity to respond; if issues are not fairly presented, they are waived.[8] Here, however, the Complaint did not clearly allege

---

[8] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *Kroll v. City of Wilm.*, 2023 WL 6012795, at *15 (Del. Ch. Sept. 15,

17

when the purported breach occurred.[9]  Plaintiff's answering brief clarified his theory.[10]  BCV's reply brief appropriately responded to a theory that was not fully articulated until Plaintiff's answering brief explained it.

I therefore recommend that Count II be dismissed as time-barred.

## III.    CONCLUSION

For the reasons explained above, I recommend that the Motion be denied as to Count I and granted as to Count II.  This is a final report pursuant to Court of Chancery Rule 144.  Pursuant to the Chancellor's August 8, 2023 reassignment letter, exceptions to this final report are stayed pending final resolution of this matter.

---

2023) ("Arguments are . . . waived when they are not 'fairly or timely presented'" (citation omitted)).

[9] *See* Compl. ¶ 30.

[10] AB at 11-12 (explaining that "BCV gave [Plaintiff] notice of termination for Non-Performance on March 27, 2020," when "BCV could only give notice of its intent to terminate his employment for non-performance after March 31, 2020, given that performance was tied to financial results and the fiscal quarter needed to close").

18