**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| CHP III, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0867-KSJM |
| | ) | |
| BENJAMIN F. CRAVATT, THOMAS: | ) | |
| WOIWODE, CHRISTOPHER G. | ) | |
| PARKER, BELHARRA, | ) | |
| THERAPEUTICS, INC., VERSANT | ) | |
| VENTURE MANAGEMENT, LLC, | ) | |
| INCEPTION THERAPEUTICS, INC., | ) | |
| JOHN DOES 1-10, and XYZ | ) | |
| CORPORATIONS 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: September 5, 2025
Date Decided: January 15, 2026

Samuel T. Hirzel, II, Luke P. Edwards, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Caleb Hayes-Deats, Jackson A. Myers, Kayvon Ghayoumi, MOLOLAMKEN LLP, Washington, District of Columbia; Anden Chow, Joshua D. Bloom, MOLOLAMKEN LLP, New York, New York; *Counsel for Plaintiff CHP III, L.P.*

Megan Ward Cascio, Matthew R. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington Delaware; R. James Slaughter, Laurie Carr Mims, Bailey W. Heaps, KEKER, VAN NEST & PETERS LLP, San Francisco, California; *Counsel for Defendant Benjamin F. Cravatt.*

Brad D. Sorrels, Shannon E. German, Ashleigh L. Herrin, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Stephen B. Strain, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Counsel for Defendant Benjamin F. Cravatt, Defendants Thomas Woiwode, Versant Venture Management, LLC, and Inception Therapeutics, Inc.*

Catherine G. Dearlove, John D. Hendershot, Danielle I. Bell, RICHARDS, LAYTON & FINGER, P.A., Wilmington Delaware; Robert Counihan, Nicholas Klenow, FENWICK & WEST LLP, New York, New York; Catherine Kevane, FENWICK & WEST LLP, San Francisco, California; *Counsel for Defendants Christopher G. Parker and Belharra Therapeutics, Inc.*

**McCORMICK, C.**

Bayer Corporation purchased Vividion Therapeutics, Inc. for $2 billion. Before the merger, Vividion held an exclusive license to intellectual property developed by its founding chemist Ben Cravatt and owned by Scripps Research Institute. Vividion made payments to Scripps under the license agreement, and Bayer wanted to minimize those payments before closing the merger. The merger agreement thus obligated Vividion to negotiate with Scripps over the scope of the license to jettison immaterial and retain material intellectual property. In those negotiations, the individual defendants allegedly caused Vividion to release rights to one of Cravatt's patents, the '444 Application. Cravatt then caused his new pharmaceutical startup, Belharra Therapeutics, Inc., to license the '444 Application intellectual property from Scripps. Belharra later announced that it had secured a lucrative financing deal.

The plaintiff owned Vividion stock. The plaintiff alleges that the individual defendants caused Vividion to exclude the '444 Application from the license acquired by Bayer. According to the plaintiff, that conduct depressed the merger price, supporting direct claims under *Parnes v. Bally Entertainment*.[1] The defendants moved to dismiss the complaint, and this decision grants the motion. The renegotiations of the license agreement occurred after the parties fixed the merger consideration. And the merger agreement provided that those renegotiations would not affect the merger consideration. The plaintiff thus fails to allege that the individual defendants' actions affected merger price or process in any way. The plaintiff thus fails to state a claim under *Parnes* or any theory briefed by the parties.

---

[1] 722 A.2d 1243 (Del. 1999).

## I.  FACTUAL BACKGROUND

The facts are drawn from the Verified Amended Complaint (the "Amended Complaint") and documents it incorporates by reference.[2]

### A.  The Scripps License Agreement And The '444 Application

Plaintiff CHP III, L.P. ("Plaintiff") is a Delaware limited partnership that invests in early-stage healthcare technology and biotechnology companies. Plaintiff and three professors from Scripps Research Institute, a renowned nonprofit medical research institute, founded Vividion (or the "Company") in 2014. Defendant Cravatt, co-chair of Scripps's chemistry department, is one of Vividion's three founders, and served on the Vividion Board of Directors (the "Board"). As a founding investor in Vividion, Plaintiff had a designee on the Board until the merger.[3]

Soon after Vividion's founding, the Company entered into a funding and option agreement with Scripps. Under the agreement, Vividion would fund Cravatt's research in exchange for the option to license Cravatt's discoveries from Scripps. Vividion exercised the option in January 2016 and acquired an exclusive license to patents and patent applications that covered Cravatt's discoveries (the "License Agreement").[4] The license covered any drug that "comprises, utilizes or incorporates" unpatented information or "using small molecule fragments in combination with

---

[2] 2024-0867-KSJM, Docket ("Dkt.") 25 ("Am. Compl.").

[3] Am. Compl. ¶¶ 11–12, 24.

[4] *Id.* ¶¶ 30–31.

2

activity-based protein profiling directed towards . . . drug discovery."[5] The License Agreement required Vividion to use commercially reasonable efforts to meet developmental milestones; if milestones were not met by a contractually established deadline, Scripps could terminate the agreement.[6] The License Agreement also required Vividion to make milestone and royalty payments to Scripps.[7] From 2016 until the merger, Vividion licensed several of Cravatt's patents and patent applications under the License Agreement.

## B.    The '444 Application IP

Cravatt's research focuses on chemoproteomics, which everyone knows refers to the chemistry of human proteins. Technology that Cravatt developed allows for the screening and testing of naturally occurring proteins at scale. These methods generate large amounts of data, which Vividion has used to develop a proprietary library of molecules capable of binding to proteins. Protein-binding molecules play a central role in identifying and treating many diseases.[8]

In 2017, Cravatt and Defendant Christopher G. Parker, another Scripps professor and a senior advisor to Vividion, published an article with eleven other authors in the peer-reviewed scientific journal *Cell*.[9] The article described "small

---

[5] *Id.* ¶ 33; Dkt. 30 ("Defs.' Opening Br."), Ex. B ("License Agr.") § 1.13(b). This document is integral to the Complaint and thus incorporated by reference.

[6] License Agr. §§ 6.1, 12.3.

[7] *See, e.g.*, License Agr. §§ 3.4, 4.3, 5.1.

[8] Am. Compl. ¶¶ 25–28.

[9] *Id.* ¶ 39; Defs.' Opening Br., Ex. F. Parker is listed as a "first author."

molecules that bind to proteins for the purpose of studying or manipulating the protein – consisting of an 'alkyne handle' and a 'photoreactive group' that could be used to identify treatments for different proteins."[10]

In January 2018, Cravatt, Parker, and a third scientist filed a provisional patent application based on the *Cell* discoveries (which would later become the "'444 Application"). Vividion licensed the '444 Application intellectual property under an August 2018 amendment to the License Agreement.[11]

By June 2021, Vividion had identified 250 proteins that could be targeted for drug therapies. Vividion's research team decided to focus on oncology and immunology therapies given their relative speed to commercial success. The '444 Application intellectual property was not used for oncology or immunology therapy, and so it was not within Vividion's focus. But Vividion also sought to explore other fields for its proprietary technology and launched a "NewCo Exploratory Project" for that purpose. On March 18, 2021 Vividion management presented the NewCo Exploratory Project to the Board, and the Board placed Cravatt on the project team.[12]

### C.    Cravatt, Parker, And Woiwode Form Belharra.

On the same day that the Board formed the NewCo Exploratory Project, Cravatt, Parker, and Defendant Tom Woiwode formed Belharra Therapeutics, Inc. Woiwode served on the Vividion Board as a designee of Defendant Versant Venture

---

[10] Am. Compl. ¶ 39.

[11] *Id.* ¶¶ 40, 42; *see* License Agr. at 39–40; Defs.' Opening Br., Ex. C at 271–72.

[12] Am. Compl. ¶¶ 44–47.

Management, LLC, a venture capital firm. When Belharra was in its early stages, Versant-affiliated Defendant Inception Therapeutics, Inc. acted as an incubator for Belharra, providing "resources and space."[13]

### D.     Bayer Acquires Vividion.

On June 1, 2021, Bayer made a non-binding indication of interest to acquire all of Vividion's equity. After preliminary diligence, Bayer made an all-cash offer of $2 billion, with $1 billion of the merger consideration conditioned on Vividion achieving milestones post-closing. Over the following weeks, the parties negotiated a merger agreement.[14]

Vividion had been gearing up for an IPO and still planned to move forward with one if the Bayer deal did not go through by early July. Vividion's advisor Centerview Partners was concerned that information about Vividion's intellectual property portfolio could leak before the IPO. So Centerview advised the Board not to conduct a market check on Bayer's offer and not to conduct an independent analysis of any intellectual property rights that Vividion would release in the transaction.[15]

The parties quickly negotiated an Agreement and Plan of Merger (the "Merger Agreement"), which they signed on July 9, 2021. The final agreement reflected $2 billion in consideration, but the Merger Agreement made only $500 million of the

---

[13] *Id.* ¶ 49 (citing Belharra Therapeutics, *Belharra Therapeutics Debuts With $130 Million in Funding*, https://belharratx.com/press-releases/belharra-therapeutics-debuts-with-130-million-in-funding (Jan. 4, 2023)).

[14] *Id.* ¶¶ 54–55.

[15] *Id.* ¶ 68.

merger consideration contingent on the achievement of post-closing milestones.[16] Bayer agreed to pay the rest upfront.[17]

The Merger Agreement discussed obligations concerning Vividion's License Agreement with Scripps and its intellectual property portfolio. Bayer did not want to make unnecessary royalty or milestone payments to Scripps post-merger. So, Section 5.20 of the Merger Agreement required Vividion to use "commercially reasonable efforts to amend" the License Agreement to relinquish its exclusive right to certain intellectual property under Section 5.1(j) of the disclosure schedule, in exchange for relief from diligence obligations and obligations to make royalty and milestone payments.[18] But Bayer wished to retain rights to use Vividion's material intellectual property. So, in Section 5.1(j) of the Merger Agreement, Vividion covenanted that it would not "amend in any material respect," or "knowingly waive, release or assign any material right of the Company under . . . any material IP Agreements," other than "as set forth in Section 5.1 of the [disclosure schedule]."[19]

The parties adopted a flexible approach to the License Agreement amendment process. The disclosure schedule stated that Vividion would return some "platform IP" to Scripps but retain an exclusive license to "certain IP" from "Dr. Cravatt's lab."[20]

---

[16] *Id.* ¶ 55.

[17] All of the $500 million in milestone payments were made. *Id.*

[18] *See* Am. Compl., Ex. A ("Merger Agr.") § 5.20; Am. Compl., Ex. A at 173–284 ("Disclosure Schedule") § 5.1(j) (requiring that Vividion use commercially reasonable efforts to terminate parts of the License Agreement and limit royalty payments).

[19] Merger Agr. § 5.1(j); *id.* § 5.1.

[20] Disclosure Schedule § 5.1(j).

The Merger Agreement required Vividion to keep Bayer informed of the negotiations and consider Bayer's suggestions in good faith. But under the Merger Agreement, the merger consideration would not change depending on Vividion's negotiations with Scripps concerning the License Agreement. The Merger Agreement only required Vividion to use "commercially reasonable efforts" to release certain intellectual property, and stated that Vividion's failure to amend the License Agreement would not constitute a covenant breach.[21] The Merger Agreement did not contemplate any change in the merger price if Vividion failed to amend the License Agreement; the only "contingent" or "additional" consideration discussed in Merger Agreement relate to milestone payments and pre-closing accounting adjustments.[22] And as stated above, the License Agreement amendment process was carved out of Vividion's covenant not to release any material intellectual property.[23]

Before the merger closed, Vividion amended its License Agreement with Scripps. The amendment released Vividion's license to the '444 Application intellectual property.

The Merger Agreement contains two representations relevant to this litigation. First, in Section 3.14(b), Vividion represented that it owned and possessed all rights to use all material intellectual property ("IP"), other than identified licenses, that was

---

[21] Merger Agr. § 5.20; *see id.* § 6.3.

[22] *See id.* §§ 2.11, 2.13, 2.15; *see also id.* § 1.1 (defining "Closing Merger Consideration" as $1.5 billion, subject to accounting adjustments and shareholder-representative reserves).

[23] *Id.* § 5.1(j).

7

necessary for Vividion's business.[24]  Second, Section 3.14(h) stated that Vividion's current and former employees, contractors, and consultants had executed "IP Agreements" assigning all "inventions and Intellectual Property rights" to Vividion.[25] The representation also stated that to Vividion's knowledge, no current or former employees, contractors, or consultants were in violation of the IP Agreements.  These representations allowed Bayer to forgo post-closing indemnification rights and secure representation and warranty insurance.[26]  The transaction (the "Merger") closed on August 19, 2021.

## E. Belharra Launches A Product After Vividion Merges With Bayer.

After the Merger closed, Scripps licensed the '444 Application IP to Belharra, which emerged in January 2023 with "a novel-photoaffinity-based chemoproteomics platform capable of identifying non-covalent, small molecule drug candidates for any protein" and $130 million in financing.[27]  Versant provided $50 million of the financing in Belharra's Series A funding round.  Another $80 million came from Genentech, a large pharmaceutical company that also committed to up to $2 billion in milestone payments.[28]  On its webpage listing "[b]edrock" scientific findings that

---

[24] *Id.* § 3.14(b).

[25] *Id.* § 3.14(h).

[26] Am. Compl. ¶¶ 55–56.

[27] *Id.* ¶¶ 50–51; Belharra Therapeutics, *Belharra Therapeutics Debuts With $130 Million in Funding*, *supra*.

[28] *Id.* ¶¶ 50, 82 (citing Belharra Therapeutics, *Belharra Therapeutics Announces Broad Collaboration with Genentech to Discover and Develop Novel Medicines Across Multiple Therapeutic Areas* (Jan. 4, 2023), https://belharratx.com/press-

8

"helped build [its] technology," Belharra names three scientific publications, one of which is the *Cell* article.[29]  In June 2024, Belharra received $40 million in upfront funding from another company and up to $700 million in subsequent payments.[30]

### F.    This Litigation

Based in part on Belharra's post-Merger success, Plaintiff claims that Cravatt manipulated the Merger process by obstructing the value of the '444 Application IP and that the value associated with the released '444 Application IP should have increased the amount of Merger consideration paid to Vividion's stockholders.

Plaintiff filed this suit on August 19, 2024, against Cravatt, Woiwode, Parker (the "Individual Defendants"), Belharra, Versant, and Inception.  Plaintiff also names as defendants "John Does 1–10" and "XYZ Corporations 1–10" (together with the Individual Defendants, Belharra, Versant, and Inception, the "Defendants"), representing unknown individuals and corporations that conspired with the other Defendants.[31]  Defendants moved to dismiss the complaint on November 13, 2024.[32] Plaintiff amended the complaint in response.[33]

---

release/belharra-therapeutics-announces-broad-collaboration-with-genentech-to-discover-and-develop-novel-medicines-across-multiple-therapeutic-areas/).

[29] *Id.* ¶ 52; Belharra Therapeutics, *Publications*, https://belharratx.com/our-approach/publications (last visited Oct. 19, 2025).

[30] *Id.* ¶ 82.

[31] *Id.* ¶¶ 18–19.

[32] Dkt. 11.

[33] Dkt. 25.

As amended, Plaintiff asserts four causes of action. In Count I, Plaintiff claims that Cravatt and Woiwode breached their fiduciary duties by affirmatively misrepresenting the value of the '444 Application IP when negotiating the Merger Agreement and that they did so for their personal gain. In doing so, they depressed the value of the Merger consideration received by Vividion's stockholders.[34] In Count II, Plaintiff claims that Parker, Belharra, Versant, and Inception aided and abetted Cravatt and Woiwode in their fiduciary breaches.[35] In Count III, Plaintiff claims that Cravatt and Woiwode defrauded the Vividion Board of Directors by misrepresenting the value of the '444 Application IP.[36] In Count IV, Plaintiff claims that Cravatt, Woiwode, Parker, Belharra, and Versant were unjustly enriched by the wrongful conduct.[37]

Defendants renewed their motion to dismiss, and the parties completed briefing on April 11, 2025.[38]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rules 23.1 and 12(b)(6). "[T]he governing pleading standard in Delaware

---

[34] Am. Compl. ¶¶ 91, 93.

[35] *Id.* ¶¶ 97–102.

[36] *Id.* ¶¶ 107, 109.

[37] *Id.* ¶ 117.

[38] Dkts. 30, 44, 50. Before oral argument on July 29, 2025, the Delaware Supreme Court published *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324 (Del. 2025), clarifying the elements of an aiding and abetting claim. The court requested supplemental briefing on *Columbia*, which the parties completed on September 5, 2025. Dkts. 77, 80, 81.

to survive a motion to dismiss is reasonable 'conceivability.'"[39] When considering a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[40] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[41]

Defendants' primary argument for dismissal is that Plaintiff's claim is derivative and was extinguished with the Merger.[42] Plaintiff responds that the Amended Complaint states a direct claim under *Parnes*.[43]

*Parnes* involved a merger between Bally and Hilton Hotels. The merger required the consent of the Bally Chairman and CEO. During merger negotiations, the CEO declared that, to obtain his consent, an acquiror would have to pay him substantial sums and Bally assets. Many potential bidders walked away, but Hilton agreed to the CEO's demands. And the Bally board of directors approved payment of

---

[39] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[40] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[41] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[42] *See Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984); *Goldstein v. Denner*, 2022 WL 1797224 (Del. Ch. June 2, 2022); *see also* Defs.' Opening Br. at 15–29 (applying *Lewis*).

[43] 722 A.2d 1243 (Del. 1999); *see also* Dkt. 44 ("Pl.'s Answering Br.") at 16–26 (applying *Parnes*).

11

a termination fee, compensation package, warrants, and stocks conditioned on consummation of the merger. The plaintiffs claimed that the compensation package constituted waste, which is a quintessential derivative claim. The trial court therefore treated the claims challenging the compensation package as derivative and dismissed the complaint for lack of standing.

The high court reversed, holding that stockholders suffer a direct injury when a "fiduciary extract[s] for himself 'valuable corporate assets' while the corporation was engaging in a sale process," because the acquiror otherwise "'might have paid a higher price' for the corporation."[44] The high court held that a stockholder may "challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[45] The court concluded that the Bally plaintiff met this standard and stated a direct claim.

Plaintiff claims that Bayer might have paid a higher price had the Individual Defendants not fraudulently concealed the value of the '444 Application IP. In *Primedia, Inc. Shareholder Litigation*,[46] the court implemented this variant of *Parnes* through a three-part test. That test asks:

> First, has the plaintiff pled an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim on which relief could be granted?

---

[44] *Brokerage Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L Komen Tr. for Komen v. Breyer*, 2020 WL 3484956, at *8 (Del. Ch. June 26, 2020) (quoting *Parnes*, 722 A.2d at 1245–46).

[45] *Parnes*, 722 A.2d at 1245.

[46] 67 A.3d 455 (Del. Ch. 2013).

> Second, is the value of the derivative claim material in the context of the merger?
>
> Third, does the complaint support a pleading-stage inference that the acquirer would not assert the underlying derivative claim and did not provide value for it?[47]

Plaintiff must meet all elements of the test. Plaintiff cannot meet the second element because Plaintiff cannot demonstrate that the derivative claim was material in the context of the merger. The crux of Plaintiff's claim is that, during negotiations with Scripps concerning material and immaterial IP, the Individual Defendants misrepresented the value of the '444 Application IP for self-interested reasons.[48] But the parties signed the Merger Agreement before the Individual Defendants renegotiated the Scripps License Agreement. The Merger Agreement fixed a $2 billion price regardless of the outcome of those renegotiations. Before the parties signed the Merger Agreement, Bayer conducted diligence into Vividion's IP portfolio.[49] And Plaintiff does not claim that the Individual Defendants obscured Bayer's diligence into Vividion's IP portfolio before entering into the Merger Agreement or otherwise manipulated the Merger process to benefit themselves at the expense of the other stockholders. It is not reasonably conceivable, therefore, that the Individual Defendants' alleged bad acts in connection with the renegotiations affected the merger consideration in any way.

---

[47] *See Goldstein*, 2022 WL 1797224, at *10 (summarizing the *Primedia* factors as endorsed by the high court in *Morris v. Spectra Energy P'rs (DE) GP, LP*, 426 A.3d 121, 129 (Del. 2021)).

[48] Am. Compl. ¶ 65.

[49] *Id.* ¶ 56.

Because Plaintiff cannot demonstrate that the derivative claim was material in the context of the Merger, Plaintiff does not meet the *Parnes/Primedia* standard. Plaintiff's claim concerning the diversion of the '444 Application IP was therefore derivative and extinguished with the Merger.

The parties briefed myriad overlapping legal theories. Plaintiff's claim for breach of fiduciary duties also fails if Plaintiff advances a *Parnes* claim based on the Merger process as in *Goldstein v. Denner*,[50] a side-deal claim akin to *Blue v. Fireman*,[51] or a fraud-on-the-board claim similar to that in *In re Mindbody Stockholders Litigation*.[52] The throughline in each of these legal frameworks is that a plaintiff must plead facts from which the court can infer, at a minimum, that the fiduciary tainted the sale process.[53]

---

[50] *See Goldstein v. Denner*, 2022 WL 1671006 (Del. Ch. May 26, 2022) (denying motion to dismiss, analyzing claims challenging a merger that allowed one defendant to capture profits on shares he secretly purchased under *Revlon* and *Corwin*); *Goldstein*, 2022 WL 1797224 (denying motion to dismiss, analyzing the same claims under *Parnes* to determine whether the conduct giving rise to the derivative claim had a material effect on the merger process).

[51] *Blue v. Fireman*, 2022 WL 593899 (Del. Ch. Feb. 28, 2022) (granting motion to dismiss and marshalling cases addressing claims challenging the effect of "side deals" on a merger).

[52] *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149 (Del. Ch. Mar. 15, 2023) (granting post-trial judgment for plaintiff on paradigmatic *Revlon* claim alleging that the conflicts of the CEO tainted the sales process), *rev'd on other grounds* 332 A.3d 349 (Del. 2024).

[53] *See Goldstein*, 2022 WL 1797224, at *12 (denying a motion to dismiss where the plaintiff alleged that a director defendant delayed a sale process and forced a single-bidder process to "maximiz[e] short-term profits from insider trading"); *Blue*, 2022 WL 593899, at *11–15 (denying a motion to dismiss where a controller defendant allegedly "threatened to derail the deal and withhold its approval" unless the board approved favorable amendments that "necessarily came at the expense of other stockholders"); *Mindbody*, 2023 WL 2518149, at *34–39 (entering post-trial judgment

14

It is not reasonably conceivable that the Individual Defendants tainted the Merger process by renegotiating the Scripps Licensing Agreement. The primary reason why this is not reasonably conceivable is that the renegotiation occurred after the parties signed the Merger Agreement.

Another reason is that this was not a typical "side deal." The Individual Defendants did not obtain the '444 Application IP directly through the renegotiation or by operation of the Merger. Rather, they negotiated for Scripps to retain the '444 Application IP, which the Individual Defendants later licensed from Scripps. There is no allegation that an internationally renowned research institute was complicit in the Individual Defendants' alleged scheme. The once-removed nature of the alleged usurpation makes it hard to track Plaintiff's theory of Merger-process defects.

Yet another reason why Plaintiff's claim fails is because Plaintiff did not allege that the Individual Defendants somehow manipulated the other members of the Board during the Merger negotiations or otherwise infect the Merger process.

For these reasons, Count I fails to state a claim for breach of fiduciary duties. Count III, for fraud, is based on the same alleged misrepresentations at issue in Count I and fails for that reason. Count II, for aiding and abetting, and Count IV, for unjust enrichment, fail for lack of a valid predicate.

## III. CONCLUSION

The Amended Complaint is dismissed with prejudice.

---

against an officer and director who "titled the sale process in [the buyer's] favor" by helping the buyer get ahead while heel-dragging with other bidders).

15