**CENTRAL MORTGAGE COMPANY, Plaintiff Below Appellant,**

v.

**MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC as Successor-in-interest to Morgan Stanley Mortgage Capital, Inc., Defendant Below Appellee.**

No. 595, 2010.

Supreme Court of Delaware.

Submitted: May 25, 2011.
Decided: Aug. 18, 2011.

R. Judson Scaggs, Jr. and John Eakins, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Of Counsel: Nicholas J. Boyle (argued), Richard Olderman and Daniel M. Dockery, Williams & Connolly LLP, Washington, DC for appellant.

Steven J. Fineman and Rudolf Koch, Richards, Layton & Finger, P.A., Wilmington, Delaware. Of Counsel: Jeffrey Q. Smith (argued), Laila Abou–Rahme, and Cynthia A. Hanawalt, Bingham McCutchen LLP, New York, N.Y. for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices constituting the Court en Banc.

STEELE, Chief Justice:

Central Mortgage Company sued Morgan Stanley after mortgages for which CMC purchased servicing rights from Morgan Stanley began to fall delinquent during the early financial crisis in 2007. CMC made a variety of claims, and the Vice Chancellor[1] dismissed all of those claims with prejudice, except for its breach of contract claims which he dismissed without prejudice. CMC now appeals the dismissal of its breach of contract and implied covenant of good faith and fair dealing claims. We reverse.

## I. FACTS AND PROCEDURAL HISTORY

Morgan Stanley is in the business of purchasing residential mortgage loans

---

1. Chancellor Strine adjudicated Morgan Stanley's Motion to Dismiss while sitting as a Vice Chancellor. Although the Governor has elevated him to the position of Chancellor since he adjudicated this matter, this opinion refers to him as the Vice Chancellor because that was the capacity in which he acted.

from originators, pooling them, and selling these pools to investors either securitized or in bulk. It regularly sells servicing rights for these loans to third party servicers. Loan servicers generally handle the operational aspects of mortgage lending, which include billing, collecting payments from mortgagors, and remitting payments to mortgagees. Generally, servicers retain a small percentage of payments collected as compensation. CMC is a servicer of residential mortgage loans.

In March 2005, Morgan Stanley offered about $1 billion in mortgage servicing rights for a servicer to purchase on a regular basis in the forthcoming months and years. These rights pertained to pooled mortgage loans that Morgan Stanley planned to sell to both Fannie Mae and Freddie Mac (collectively, the Agencies) as well as private investors. The offering materials explained that Morgan Stanley did not originate the loans and that all the loans were "Alt–A" in quality—lower quality than prime loans, but higher quality than subprime loans. CMC bid on the servicing rights, and Morgan Stanley accepted CMC's bid in July 2005.

On July 25, 2005, Morgan Stanley and CMC signed a Master Agreement which, in 66 pages and 15 exhibits, established the framework for a series of future transactions between the parties. Specifically, the Master Agreement gave CMC the opportunity, but not the obligation, to purchase servicing rights on specific pools of loans. In the Master Agreement, the parties agreed that New York law would govern the contract and Delaware courts would have exclusive jurisdiction over disputes.

If CMC decided to buy servicing rights with respect to loans Morgan Stanley sold to the Agencies, the Master Agreement required CMC to service those loans in strict compliance with Agency guidelines.

The Master Agreement contained an integration clause specifying that it, along with the documents for each future transaction between the parties, constituted the parties' entire agreement. The Master Agreement also provided that the parties could only amend it in a signed writing. In the Master Agreement, Morgan Stanley made representations and warranties to CMC, and it assigned to CMC all representations and warranties that the originators of the subject loans had made to Morgan Stanley. The Master Agreement also provided a notice provision in section 10.13. Specifically, the notice provision provided:

> Upon discovery by either [Morgan Stanley] or [CMC] of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the other party. Within 60 days of the earlier of either discovery by or notice to [Morgan Stanley] of any such breach of a representation or warrant which materially and adversely affects the ownership interest of [CMC] in the Servicing Rights related to any Mortgage Loan, [Morgan Stanley] shall use its best efforts to promptly cure such breach in all material respects and, if such breach cannot be cured, [Morgan Stanley] shall, at [CMC's] option, repurchase the Servicing Rights affected by such breach at the Purchase Price.

The Master Agreement also contained a clause explaining that except as otherwise set forth, no remedy was exclusive of any other available remedy. Finally, the Master Agreement contained a clause explaining that the parties could only waive a breach with written notice and the consent of all parties.

In February 2006, CMC visited Morgan Stanley's due diligence facilities. CMC alleges that during this visit Morgan Stanley

assured CMC that it was performing due diligence on residential mortgage loans in accordance with the Agencies' guidelines. Importantly, Morgan Stanley told CMC that the Agencies will not purchase loans from Morgan Stanley or other sellers unless the Agencies have reviewed and approved the underwriting criteria and the available information on the loans. Because the Agencies review and approve Morgan Stanley's underwriting guidelines before purchasing its loans, the Agencies issue guidance regarding their underwriting expectations. Allegedly, Morgan Stanley took great pains during CMC's visit to convince CMC that it paid close attention to this Agency guidance.

On March 16, 2006, CMC made its first purchase of servicing rights on pooled loans Morgan Stanley sold to the Agencies. CMC then made five separate additional purchases of servicing rights between January 31, 2007 and August 2007 for pooled loans Morgan Stanley sold to the Agencies. For each of the six separate purchase transactions, CMC and Morgan Stanley signed transaction specific documentation, which included a commitment letter, a purchase agreement, a sale of servicing rights agreement, and a "Form 981" or "Form 629" (together, the Agency Transfer Agreements) regarding the transfer of the servicing rights.[2] The Agency Transfer Agreements provided that CMC, as transferee of the servicing rights, "acknowledge[d], covenant[ed] and warrant[ed] that it shall be responsible for all representations, covenants, and warranties concerning the eligibility of Mortgages for purchase by" the relevant Agency as provided in that Agency's guidelines. Under these Agency Transfer Agreements and Agency

guidelines, Morgan Stanley and CMC became jointly and severally liable to the Agencies for all the responsibilities, duties, and selling warranties associated with the mortgages.

In early 2007, CMC began to notice that the loans it had purchased from Morgan Stanley were not performing at the level the parties had expected. CMC raised this concern with Morgan Stanley, and in response, Morgan Stanley allegedly admitted to a technical oversight and its failure to properly diligence the loans at issue. Morgan Stanley agreed to reduce the price of the servicing rights by 2% and to otherwise "take care" of CMC. The parties also negotiated a written amendment to the Master Agreement, which the parties signed and dated retroactively to apply from January 2007 forward. The amendment required Morgan Stanley to repurchase servicing rights at CMC's option for any mortgage loans that, starting in January 2007, fell delinquent by 90 or more days within the first 12 months after their sale date. Also, in that amendment, CMC and Morgan Stanley "in all respects ratified and confirmed" all the other terms, provisions, and conditions of the Master Agreement.

In early 2008, the Agencies began sending repurchase and make whole demands to CMC, as servicer of the loans, because many of the mortgages allegedly did not satisfy Agency guidelines. The Agency Transfer Agreements obligated CMC either to repurchase the loans or to pay the make whole amounts. Initially, CMC merely forwarded the repurchase or make whole requests to Morgan Stanley, which then either repurchased the loans from

---

**2.** The parties submitted a Form 981 to Freddie Mac for its loans. They submitted a Form 629 to Fannie Mae for its loans. The integration clause of the Master Agreement made each of these transaction specific docu-

ments—except for the Agency Transfer Agreements—part of the complete and binding agreement between Morgan Stanley and CMC.

CMC or reimbursed CMC for make whole payments 47 times in 2008 and early 2009.

At some point, Morgan Stanley stopped repurchasing from, and reimbursing, CMC. CMC alleges that it gave Morgan Stanley notice that Morgan Stanley had breached its agreements with CMC by failing to take back the loans the Agencies had returned to CMC but that Morgan Stanley declined to cure. Instead, CMC itself either repurchased the loans from the Agencies or paid make whole payments with respect to about 50 loans after March 2009 that Morgan Stanley did not repurchase or reimburse. When CMC filed this Court of Chancery action on December 14, 2009, 140 additional Agency repurchase or reimbursement demands were pending.

In its complaint, CMC asserted 10 claims for relief against Morgan Stanley. Specifically, CMC claimed that Morgan Stanley breached the Master Agreement, breached the representations and warranties it made in the Master Agreement and the other transaction specific documents, repudiated the Master Agreement, breached the implied covenant of good faith and fair dealing, unjustly enriched itself, has an implied duty to indemnify CMC requiring it to reimburse CMC for repurchases and make whole payments, and negligently misrepresented the characteristics of the loans it sold the Agencies. CMC also argued that the court should rescind the Master Agreement because of CMC's unilateral mistake regarding the nature of the loans for which CMC purchased servicing rights. Finally, CMC alleged that Morgan Stanley should be estopped from denying repurchase or repayment because CMC relied on Morgan Stanley's promise that the loans satisfied Agency requirements and that it would indemnify CMC for any problems arising out of the sale of the loans to the Agencies.

Morgan Stanley moved to dismiss all of CMC's claims. On August 19, 2010, the Vice Chancellor dismissed all of CMC's claims, but dismissed the breach of contract claims without prejudice, inviting CMC to replead them after providing proper notice. CMC now appeals the Vice Chancellor's dismissal, without prejudice, of its breach of contract claims, as well as the Vice Chancellor's dismissal, with prejudice, of its claim that Morgan Stanley breached the implied covenant of good faith and fair dealing.

## II. STANDARD OF REVIEW

 We review trial court rulings granting motions to dismiss de novo.[3] We also review de novo the Court of Chancery's interpretation of written agreements.[4] When reviewing a ruling on a motion to dismiss, we (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) do not affirm a dismissal unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[5]

## III. ANALYSIS

The only claims that CMC contests in this appeal are CMC's two breach of con-

---

**3.** *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896 (Del.2002).

**4.** *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 817 A.2d 160, 170 (Del.2002).

**5.** *Savor,* 812 A.2d at 896–97.

tract claims[6] and its claim for breach of the implied covenant of good faith and fair dealing. Pursuant to the Master Agreement, New York law governs CMC's substantive claims. The Vice Chancellor dismissed all three claims, but dismissed the breach of contract claims without prejudice on the basis of CMC's alleged failure to follow the Master Agreement's notice provision.

## A. THE VICE CHANCELLOR ERRONEOUSLY DISMISSED CMC'S BREACH OF CONTRACT CLAIMS ON THE BASIS OF INADEQUATE NOTICE.

■ The Vice Chancellor dismissed CMC's breach of contract claims on the basis that CMC failed to follow the requirements of the notice provision—namely, that CMC failed to provide Morgan Stanley adequate notice of the alleged breaches and a 60 day opportunity to cure those breaches. The Vice Chancellor explained:

> There are two reasons why CMC failed to give notice under the contract. First, attaching an exhibit to the complaint is not contractually proper notice under the Master Agreement, which required prompt written notice that allowed Morgan Stanley an opportunity to cure. CMC's exhibit does not provide Morgan Stanley with an opportunity to cure, because it was provided after CMC had initiated suit against Morgan Stanley and because it does not spell out what the breaches actually entailed. Second, forwarding Agency loan files to Morgan

Stanley after the Agencies returned the loans for noncompliance with Agency guidelines is not proper notice because CMC did not point out to Morgan Stanley where the representations and warranties in the Master Agreement had been violated.[7]

In other words, the Vice Chancellor concluded that CMC had failed to provide adequate notice to Morgan Stanley because the spreadsheet CMC attached to the Complaint came too late to be "prompt" and because the Agency loan files that CMC previously forwarded to Morgan Stanley did not identify the breaches under the Master Agreement with sufficient specificity.

The pleading standards governing the motion to dismiss stage of a proceeding in Delaware, however, are minimal.[8] When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[9] Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss.

We most recently reaffirmed this "conceivability" pleading standard as governing

---

6. Specifically, CMC claims that Morgan Stanley (1) breached the Master Agreement by selling servicing rights for loans that were never Agency eligible and (2) separately breached the representations and warranties it made in the Master Agreement with respect to the loans that are the subject of the servicing rights.

7. Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC, 2010 WL 3258620, at *8 (Del.Ch. Aug. 19, 2010).

8. See Savor, 812 A.2d at 896.

9. Id. at 896–97.

Delaware law in 2002. Then, in 2007, the United States Supreme Court, in *Bell Atlantic Corp. v. Twombly*, held that the proper pleading standard for certain federal antitrust claims to survive motions to dismiss is not "conceivability," but rather "plausibility." [10] In 2009, the Supreme Court, in *Ashcroft v. Iqbal*, further explained this "plausibility" standard [11] and confirmed that it applied to all federal civil actions. [12] The *Twombly–Iqbal* "plausibility" pleading standard is higher than our governing "conceivability" standard, and it invites judges to "determin[e] whether a complaint states a plausible claim for relief" and "draw on . . . judicial experience and common sense." [13]

Since the Supreme Court decided *Twombly* in 2007, various members of the Court of Chancery have cited the *Twom-bly–Iqbal* "plausibility" standard with approval when adjudicating motions to dismiss. [14] We have not had occasion yet to address the impact, if any, that the United States Supreme Court's holdings in *Twombly* and *Iqbal* should have on the Delaware standard. Indeed, the Vice Chancellor explicitly cited the "plausibility" standard in this very case. [15] We decline to use this case as the vehicle to address whether the *Twombly–Iqbal* holdings affect our governing standard, considering that the parties have not fully and fairly litigated the issue before either the Vice Chancellor or this Court. Instead, we emphasize that, until this Court decides otherwise or a change is duly effected through the Civil Rules process, the governing pleading standard in Delaware to survive a motion to dismiss is reasonable "conceivability." [16]

---

10. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("[W]e hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage. . . .").

11. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (citations omitted) (internal quotation marks omitted).

12. *Id.* at 1953.

13. *Id.* at 1950. Our governing "conceivability" standard is more akin to "possibility," while the federal "plausibility" standard falls somewhere beyond mere "possibility" but short of "probability."

14. *See, e.g., QVT Fund LP v. Eurohypo Capital Funding LLC I*, 2011 WL 2672092 (Del.Ch. July 8, 2011); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, 2011 WL 1348438 (Del.Ch. Apr. 8, 2011); *Nichols v. Chrysler Group, LLC*, 2010 WL 5549048 (Del.Ch. Dec. 29, 2010); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455 (Del.Ch. Dec. 30, 2010); *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405 (Del.Ch. Dec. 22, 2010); *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391 (Del.Ch. July 20, 2010); *Morgan v. Cash*, 2010 WL 2803746 (Del.Ch. July 16, 2010); *BASF Corp. v. POSM II Props. P'ship, L.P.*, 2009 WL 522721 (Del.Ch. Mar. 3, 2009); *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865 (Del.Ch. Jan. 20, 2009); *In re Seneca Invs. LLC*, 970 A.2d 259 (Del.Ch. 2008); *Rhodes v. Silkroad Equity, LLC*, 2007 WL 2058736 (Del.Ch. July 11, 2007); *Desimone v. Barrows*, 924 A.2d 908 (Del.Ch.2007).

15. *See Central Mortgage Co.*, 2010 WL 3258620, at *7 (citing *Desimone*, 924 A.2d at 929).

16. *Cf. Webb v. Nashville Area Habitat for Humanity*, 2011 WL 2905584, at *6 (Tenn.2011) (declining to adopt the *Twombly–Iqbal* standard in Tennessee after full and fair litigation of the issue "squarely present[ed]" it to the court).

In this case, CMC alleged at Paragraph 79 of its Complaint that:

> For every loan that Morgan Stanley has refused to repurchase from, or reimburse, Central Mortgage, Central Mortgage has given Morgan Stanley notice and at least 60 days opportunity to cure its breaches by notifying Morgan Stanley of the repurchase or reimbursement request and the specific grounds on which the relevant Agency required the repurchase or reimbursement. Morgan Stanley has declined to cure the breach with respect to the loans at issue in this case.

In this pleading, CMC asserts that it provided notice independent of the spreadsheet it attached to its Complaint, and that the notice it provided included "specific grounds." The Vice Chancellor decided that forwarding the Agency loan files, as CMC alleged it did, provided insufficiently specific notice to satisfy the Master Agreement's notice requirements. Whether this notice was sufficient as a matter of fact is an inquiry more appropriate for a later stage of the proceeding. We, therefore, take no position on the issue at this stage. All that matters at the motion to dismiss stage is that CMC's well-pleaded Complaint alleges that it provided adequate notice to Morgan Stanley and that its claim, if proven, would entitle CMC to relief under a reasonably conceivable set of circumstances.

In this connection, the Complaint also alleges, and it bears notation, that on 47 separate occasions, Morgan Stanley in fact repurchased loans from CMC or reimbursed CMC for make whole payments CMC paid the Agencies. Morgan Stanley responded those 47 times based solely on CMC forwarding Agency loan files to Morgan Stanley. On appeal, CMC contends that this fact alone proves that forwarding the loan files constituted sufficient notice. Morgan Stanley asserts, however, that in those 47 instances it did not act out of a contractual obligation and that its conduct does not establish that CMC satisfied the notice provision of the Master Agreement. Rather, Morgan Stanley asserts that it repurchased or reimbursed those 47 times only to preserve a positive working relationship with CMC. At the motion to dismiss stage, however, it matters not which party's assertions are actually true. We must draw all reasonable inferences in favor of CMC, and it is reasonable to infer that Morgan Stanley repurchased or reimbursed the first 47 times because it had sufficient notice of its breaches and was acting to cure them.

By eliding the inquiry—whether CMC's well-pleaded Complaint stated a claim that is provable under any reasonably conceivable set of circumstances—and instead deciding substantively that CMC did not provide adequate notice, the Vice Chancellor inappropriately shifted the burden and held CMC to a higher standard than required.[17] To reiterate, at this stage, we make no judgment on the substantive adequacy of the notice. We also decline to address CMC's alternative claim that under New York law the notice provision is not a condition precedent to filing suit. For even assuming the notice provision is a condition precedent, CMC's well-pleaded complaint adequately pleads compliance with that provision.[18] We reverse the Vice Chancellor's dismissal of CMC's breach of

---

17. *See id.*

18. *See id. See also* Ct. Ch. R. 9(c) ("Conditions precedent.—In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity.").

contract claims because CMC's pleadings regarding notice satisfy the minimal standards required at this early stage of litigation.

### B. THE VICE CHANCELLOR ERRONEOUSLY DISMISSED CMC'S IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM.

■ The Vice Chancellor dismissed CMC's claim that Morgan Stanley breached the implied covenant of good faith and fair dealing on the basis that the factual basis for the claim was the same as, and was therefore subsumed by, CMC's breach of contract claims.[19] CMC pleaded various additional facts, however, that provide a separate basis for its implied covenant of good faith and fair dealing claim. Therefore, the claim should not have been dismissed.

■ New York law implies an obligation of good faith and fair dealing into all contracts.[20] New York's implied covenant "requires that no party to [a] contract . . . do anything which will destroy or injure the right of another party to receive the benefits of the contract." [21] A party may breach the implied covenant even if it is not in breach of the underlying contract.[22]

■ Importantly for this case, under New York law a party may maintain a claim for breach of the implied covenant of good faith and fair dealing only if the factual allegations underlying the implied covenant claim differ from those underlying an accompanying breach of contract claim.[23] Thus, where a claim for breach of the implied covenant is duplicative of a breach of contract claim, the implied covenant claim is subject to dismissal.[24] On the other hand, when a claim for breach of the implied covenant depends on facts apart from those that might support a breach of contract claim, then the claim is not duplicative and is not subject to dismissal.[25]

In this case, CMC pleaded two separate breach of contract claims in addition to its claim that Morgan Stanley breached the implied covenant of good faith and fair dealing. The essence of its first breach of contract claim is simple. As CMC explained in Paragraph 97 of its Complaint:

> Morgan Stanley has materially breached the contract by selling the servicing of nearly fifty (so-far-confirmed) non-Agency mortgages.

In other words, in its first breach of contract claim, CMC pleaded that (1) the contract required Morgan Stanley to sell CMC only "Agency mortgages," and (2) Morgan Stanley failed to perform that obligation. The essence of its second breach

19. *Central Mortgage Co.*, 2010 WL 3258620, at *10 ("[B]ecause there is 'no difference between the factual underpinnings of [CMC's] breach of contract claims and its claim for breach of the implied covenant of good faith and fair dealing,' Count IV is dismissed.") (quoting *Sauer v. Xerox Corp.*, 95 F.Supp.2d 125, 132 (W.D.N.Y.2000)).

20. *Wells Fargo Bank NW, N.A. v. Sundowner Alexandria, LLC*, 2010 WL 3238948, at *4 (S.D.N.Y. Aug. 16, 2010).

21. *Chase Manhattan Bank, N.A. v. Keystone Distribs. Inc.*, 873 F.Supp. 808, 815 (S.D.N.Y. 1994).

22. *Id.*

23. *Siradas v. Chase Lincoln First Bank, N.A.*, 1999 WL 787658, at *8 (S.D.N.Y.1999) (citing *Geler v. Nat'l Westminster Bank USA*, 770 F.Supp. 210, 215 (S.D.N.Y.1991)).

24. *Fantozzi v. Axsys Techs., Inc.*, 2007 WL 2454109, at *2 (S.D.N.Y. Aug. 20, 2007).

25. *See, e.g., id.* at *3.

of contract claim is also simple. As CMC explained in Paragraph 108 of its Complaint:

Morgan Stanley [made] multiple independent breaches of its representations and warranties, including without limitation its failure to provide true, complete, and accurate information regarding the loans . . . .

In other words, in its second breach of contract claim, CMC pleaded that (1) Morgan Stanley represented and warranted in the contract that it would perform various obligations, including providing true, complete, and accurate information regarding the loans, and (2) Morgan Stanley failed to perform that which it represented it would do.

In its claim for breach of the implied covenant, CMC does not allege that merely because Morgan Stanley breached the terms of its agreements with CMC it therefore also breached the implied covenant.[26] Instead, CMC relevantly alleges in Paragraph 123 of its Complaint:

[Morgan Stanley's] actions have impeded [CMC's] right to receive the benefits that [CMC] reasonably expected under the contract.

In other words, CMC alleges that Morgan Stanley violated the implied covenant by "depriv[ing] [CMC] of the benefit of its bargain."[27] That is a different claim from the two breach of contract claims. A different factual basis supports that claim in CMC's pleadings.

Elsewhere in its Complaint, CMC alleges that Morgan Stanley (1) had courted CMC by inviting CMC to tour its due diligence facility in Boca Raton, Florida, (2) told CMC that it had hired a company known for mortgage due diligence to review each loan file to make sure it satisfied applicable Agency underwriting criteria, and (3) eventually disclosed to CMC that it had not performed the promised due diligence on the first batch of loans for which CMC purchased servicing rights.[28] These factual allegations adequately provide the basis for CMC's implied covenant claim that Morgan Stanley engaged in a "bait and switch" by inducing CMC to buy servicing rights to its detriment.

Critically, these facts do not support either of CMC's breach of contract claims. With respect to its first breach of contract claim—that Morgan Stanley breached the contract by selling servicing rights on non-Agency mortgages—CMC nowhere alleges that the contract required Morgan Stanley to conduct certain due diligence on the mortgages. As for its second breach of contract claim—that Morgan Stanley breached its representations and warranties including its promise to provide true, complete, and accurate information about the loans—CMC also does not plead that the representations and warranties required specific due diligence. Indeed, the Master Agreement contained no representation or warranty by Morgan Stanley that it would perform due diligence—much less of a specific type or at a specific facility—on the loans. To be sure, Morgan Stanley represented and warranted that it would provide CMC with information related to the mortgage loans that is "true, complete,

---

**26.** *Contra Washington v. Kellwood Co.,* 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009) (granting motion to dismiss a claim for breach of the implied covenant because "a claim for good faith and fair dealing based on the 'breach of the terms of each agreement' is necessarily duplicative of a breach of contract claim").

**27.** *Sauer,* 95 F.Supp.2d at 132.

**28.** Specifically, CMC pleaded these facts at Paragraphs 26, 28, and 52 of its Complaint.

and accurate in all material respects." For Morgan Stanley to promise to give CMC true, complete, and accurate information is different, however, than for it to promise to perform a certain specific kind of due diligence. Morgan Stanley made the former promise in the contract—a promise that serves as part of the basis for CMC's second breach of contract claim. CMC alleges that Morgan Stanley made the latter promise outside the contract—a fact that serves as part of the basis for CMC's claim for breach of the implied covenant.

Because the claims are not duplicative, the Vice Chancellor erroneously dismissed CMC's claim for breach of the implied covenant on that basis. We do not address whether CMC's pleading with respect to the implied covenant could survive summary judgment or prevail at trial. We hold only that CMC's implied covenant claim is sufficiently distinct from its breach of contract claims and sufficiently well pleaded to survive Morgan Stanley's Motion to Dismiss.

## IV. CONCLUSION

For the foregoing reasons, we reverse the Vice Chancellor's judgment dismissing all three of CMC's claims, and remand this case to the Court of Chancery for further proceedings consistent with this Opinion.