# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAYSCALE INC., | § | |
| | § | No. 297, 2025 |
| Plaintiff Below, | § | |
| Appellant, | § | |
| | § | Court Below: Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| ERIN NORMAN and | § | C.A. No. 2025-0118 |
| BETTERCOMP, INC., | § | |
| | § | |
| Defendants Below, | § | |
| Appellee. | § | |

Submitted: January 14, 2026
Decided: March 19, 2026

Before **SEITZ**, Chief Justice; **TRAYNOR** and **LEGROW**, Justices.

Upon appeal from the Court of Chancery of the State of Delaware. **REVERSED** and **REMANDED**.

Steven L. Caponi (*argued*), Esquire, and Megan E. Hunt, Esquire, K&L GATES LLP, Wilmington, Delaware, *for Appellant Payscale, Inc.*

John A. Sensing (*argued*), Esquire, Jesse L. Noa, Esquire, Tyler E. Cragg, Esquire, and Hannah L. Paxton, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *for Appellee Erin Norman and BetterComp, Inc.*

**LEGROW**, Justice:

The Court of Chancery dismissed an employer's effort to enforce several restrictive covenants, holding that the non-compete clause was unenforceable and the employer's allegations relating to breaches of the non-solicitation and confidentiality clauses were conclusory. We hold that the court's reasoning rested on inferences it improperly drew against the employer at the pleading stage, and we therefore reverse the court's judgment. Our holding is limited to whether the employer stated a reasonably conceivable claim for relief; we express no view on whether any covenant ultimately will be enforced, reformed, or held unenforceable on a more developed record.

Payscale Inc. filed suit in the Court of Chancery upon learning that its former employee, Erin Norman, had joined a competitor, BetterComp, Inc. After the court denied a temporary restraining order and granted a motion to expedite, Norman and BetterComp jointly moved to dismiss Payscale's amended complaint, which alleged claims for breach of contract and tortious interference with contractual and prospective business relations.

The non-compete clause at issue had a nationwide, eighteen-month scope. The Court of Chancery correctly approached that restriction with skepticism, noting that Delaware courts rarely enforce such broad restrictions against employees. But notwithstanding Payscale's detailed allegations regarding its nationwide operations, Norman's role at the company, her involvement in key company-wide strategic

1

decisions, and the client-driven reasons necessitating the duration of the restriction, the court held that it was not reasonably conceivable that the non-compete's scope was enforceable in light of the minimal value that the court ascribed to the equity units that Norman received as consideration. That holding, in our view, misapplied Delaware's low pleading burden.

As to the non-solicitation and confidentiality clauses, the court dismissed as conclusory Payscale's allegations that in the two months since Norman had joined the competitor, at least five clients had followed her—numbers that were not typical in the business. The court's opinion did not address those allegations, which support a reasonable inference that Norman solicited clients or disclosed confidential information that permitted BetterComp to unfairly compete.

The court's conclusions that the non-compete was facially unenforceable and that Payscale had not adequately pleaded breaches of the other covenants prematurely weighed the facts and drew inferences against the non-moving party. We therefore **REVERSE** the court's judgment and **REMAND** for further proceedings consistent with this opinion so that the court can evaluate these claims on a more developed factual record.

I.

In 2016, Norman was briefly employed by Payscale after her initial employer merged with the company. She later left Payscale but returned in 2021 after it acquired Norman's then-employer.

About three months after rejoining Payscale, Norman entered into an incentive equity agreement with Sonic Topco, L.P. ("Topco"), Payscale's holding company. The agreement bound Norman to restrictive covenants in exchange for receiving 150,000 Topco "Profit Interest Units" ("PIUs") in the form of "Service Units" and "Performance Units."[1] Norman received twenty-five percent of the Service Units on February 23, 2023, with the remaining Service Units scheduled to vest periodically over the next three years.[2] The Performance Units would only vest upon the sale of Topco.[3]

---

[1] App. to Opening Br. at A260 (Incentive Equity Agreement § 4(a)) ("The Profits Interest Units shall be subject to vesting in the manner specified in this Section 4. With respect to the Profits Interest Units issued hereunder, 75% shall be referred to as '**Profits Interest Service Units**' and 25% shall be referred to as '**Profits Interest Performance Units**'. Profits Interest Units that have become vested are referred to herein as 'Vested Profits Interest Units'. All Profits Interest Units that have not vested are referred to herein as 'Unvested Profits Interest Units'.") (underline and bold in original). For the sake of consistency, all citations will refer to the first incentive equity agreement. As noted below, Norman later entered into a second incentive equity agreement containing substantively identical covenants.

[2] *Id.* (Incentive Equity Agreement § 4(b)) ("Recipient shall vest in (i) 25.0% of the Profits Interest Service Units on February 23, 2023 and the remainder shall vest monthly thereafter in equal amounts of the Profits Interest Service Units over the following three (3) year period thereafter (i.e., approximately 2.083% of the Profits Interest Service Units per month) . . . .").

[3] *Id.* (Incentive Equity Agreement § 4(b)) ("Recipient shall vest in . . . (ii) 100% of the Profits Interest Performance Units upon a Sale of the Partnership (each such date, a '**Vesting Date**'), in each case, so long as Recipient is and has remained an employee, officer, manager, director or consultant of the Partnership or one of its Subsidiaries from the date hereof through and including

The restrictive covenants in the incentive equity agreement include non-compete, non-solicitation, and confidentiality provisions.[4] The non-compete provision prohibits Norman from engaging in "Competitive Activity" in the United States for eighteen months after her separation from Payscale.[5] The non-solicitation provision prevents Norman from inducing any employees, clients, or other business relations from leaving Topco or its subsidiaries.[6] Norman is also barred from disclosing confidential information to other entities or individuals.[7]

In February 2023, Norman was promoted to Senior Director of Sales, overseeing Payscale's sales in the western United States.[8] About five months later, Norman executed a second incentive equity agreement with Topco that contained

---

such Vesting Date. There shall be no proportional or partial vesting in the periods prior to each Vesting Date and all vesting should only occur on the applicable Vesting Date. Notwithstanding the foregoing, the Board may, in its sole discretion, provide for accelerated vesting of the Profits Interest Units at any time.") (bold in original); *see* Answering Br. at 6–7.

[4] App. to Opening Br. at A263–67 (Incentive Equity Agreement §§ 7 and 8).

[5] *Id.* at A266 (Incentive Equity Agreement § 8(a)). "'Competitive Business' means any business conducted by the Partnership or any of its Subsidiaries as of such Recipient's Separation Date or any business proposed to be conducted by the Partnership or any of its Subsidiaries as evidenced by a written business plan in effect prior to such Recipient's Separation Date." *Id.* at A268 (Incentive Equity Agreement § 9).

[6] App. to Opening Br. at A266 (Incentive Equity Agreement § 8(b)).

[7] *Id.* at A263 (Incentive Equity Agreement § 7(a)) ("Recipient agrees that Recipient will not disclose to any unauthorized Person or use for Recipient's own (or any other Person's) account any Confidential Information without the Board's written consent . . . .").

[8] Norman was one of Payscale's three most senior sales leaders, but she did not have a C-Suite position. *See* Opening Br. at 8.

4

the same restrictive covenants as the first agreement and awarded her another 25,000 PIUs.[9]

Later that year, in December 2023, Norman voluntarily resigned from Payscale and accepted a position at a consulting firm. About ten months later, however, Payscale learned that Norman had left the consulting firm and begun working for BetterComp, a Payscale competitor.

Payscale brought three claims in the Court of Chancery: breach of contract against Norman (Count I), tortious interference with contractual relations against BetterComp (Count II), and tortious interference with prospective business relations against Norman and BetterComp (Count III). Payscale immediately moved for a temporary restraining order and to expedite the case. The Court of Chancery denied the request for a temporary restraining order but granted the motion to expedite, reasoning that Payscale pleaded a colorable claim as to all counts.

Norman and BetterComp then moved to dismiss. Payscale responded by filing an amended complaint, adding 33 paragraphs of "detailed allegations."[10] Norman and BetterComp moved to dismiss the amended complaint, and the parties briefed and argued the motion.

---

[9] App. to Opening Br. at A283 (Second Incentive Equity Agreement § 1).

[10] *See* Opening Br. at 2.

The Court of Chancery granted the defendants' motion to dismiss, holding that (i) the non-compete was unenforceable because it was overbroad in geographic scope and temporal duration, its consideration was "vanishingly small," and it was not circumscribed to protecting Payscale's legitimate business interests; (ii) Payscale did not adequately allege breaches of the non-solicitation and confidentiality provisions; (iii) the tortious interference with contractual relations claim against BetterComp failed because its viability relied upon the enforceability of the restrictive covenants; and (iv) Payscale failed to state a claim for tortious interference with prospective business relations.

Payscale appeals the Court of Chancery's holdings for the breach of contract claim against Norman (Count I) and the tortious interference with contractual relations claim against BetterComp (Count II). Payscale has not appealed the dismissal of the tortious interference with prospective business relations claim against Norman and BetterComp (Count III).

## II.

"We review *de novo* the dismissal by the Court of Chancery of a complaint under Rule 12(b)(6)."[11]

---

[11] *City of Sarasota Firefighters' Pension Fund v. Inovalon Holdings, Inc.*, 319 A.3d 271, 288 (Del. 2024) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001) (internal citation omitted)).

III.

A.

In Count I of its amended complaint, Payscale alleges that Norman breached the non-compete, non-solicitation, and confidentiality provisions in the incentive equity agreements. On appeal, Payscale contends that the trial court erred in ruling that the non-compete was unenforceable at the motion to dismiss stage because the amended complaint adequately pleads that (i) the provision's nationwide scope and temporal duration are reasonable given Norman's role, and (ii) the covenant protects Payscale's legitimate business interests. Payscale also maintains that the amended complaint pleaded sufficient facts to support its claim that Norman breached the non-solicitation and confidentiality provisions. Norman disagrees with Payscale, asserting that the non-compete is facially unenforceable and the allegations that she breached the non-solicitation and confidentiality provisions were conclusory.

To determine whether the restrictive covenant is enforceable, we look at the entirety of the agreement in light of Norman's position within the company.[12] "Delaware courts review non-compete and non-solicit agreements 'subject to Delaware law to ensure that they are (i) reasonable in geographic scope and temporal

---

[12] *See Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 753 (Del. Ch. 2023), *aff'd in part, rev'd in part*, 332 A.3d 472 (Del. 2024) ("When evaluating the reasonableness of a restrictive covenant, a court examines the restriction holistically and in context. That means evaluating all of the dimensions of the restrictive covenant and considering how it operates with other restrictions in the contract.").

7

duration, (ii) advance legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities.'"[13]  A court reviews the duration and geographic scope of a restriction together, and the restriction's reasonableness is a fact-intensive inquiry.[14]  The company's business interests and other equitable factors are independent analyses.

1.

The non-compete that Payscale seeks to enforce states:

> Noncompetition. During the Employment Period or Engagement Period, as applicable, and ending eighteen (18) months following the Separation Date (the "Protection Period"), Recipient covenants and agrees that following Recipient's termination of employment for any reason, he or she shall not engage in a Competitive Activity . . . .[15]

"Competitive Activity" is defined as to "own, manage, operate, control, participate in, render services for, or in any other manner engage in, anywhere in the United States, any Competitive Business . . . ."[16]  "Competitive Business" is defined as "any business conducted by [Topco] or any of its Subsidiaries as of [Norman's]

---

[13] *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 485 (Del. 2024) (quoting *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 684 n.65 (Del. 2024) (citation omitted)).

[14] *See Delaware Elevator, Inc. v. Williams*, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011), *judgment entered*, (Del. Ch. 2011) ("When evaluating the reasonableness of a restrictive covenant, a court must consider how the temporal and geographic restrictions operate together.").  *See also Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *3 (Del. Ch. Mar. 16, 2023).

[15] App. to Opening Br. at A266 (Incentive Equity Agreement § 8(a)).  The parties do not dispute that the non-compete has an 18-month duration.  *See* Opening Br. at 19–20; *see also* Answering Br. at 20.

[16] App. to Opening Br. at A268 (Incentive Equity Agreement § 9).

Separation Date or any business proposed to be conducted by [Topco] or any of its Subsidiaries as evidenced by a written business plan in effect prior to [Norman's] Separation Date."[17]

In dismissing Payscale's claim, the court concluded that (i) the provision's geographic scope and duration were overbroad, and (ii) the non-compete went beyond protecting Payscale's legitimate economic interests. The court reached those conclusions under Rule 12(b)(6), which requires a claimant to plead a reasonably conceivable claim. Under the rule,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[18]

Applying Rule 12(b)(6)'s minimal standard to plead a cause of action,[19] we conclude that it is reasonably conceivable that the non-compete is enforceable as applied to Norman. In holding otherwise, the trial court failed to credit Payscale's factual allegations and the reasonable inferences to be drawn from them.

---

[17] *Id.* (Incentive Equity Agreement § 9).

[18] *Erste Asset Mgmt. GmbH v. Hees*, 341 A.3d 1008, 1025 (Del. 2025) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations and internal quotation marks omitted)).

[19] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

i.

To support the covenant's geographic scope, Payscale's amended complaint alleges that Payscale operates nationwide and Norman's work at Payscale had national significance. As a Senior Director of Sales, Norman was one of Payscale's most senior sales leaders.[20] Although her role at Payscale focused on the western portion of the country,[21] Norman's work was not confined to that region.[22] Norman collaborated with directors of other regions and was involved in senior-level strategic decisions that applied across the company's various sales regions.[23] In particular, Payscale alleges that "Norman met regularly with Payscale's Chief Revenue Officer, Senior Vice President of Revenue, Vice President of Sales, and Vice President of Solutions Consulting to discuss sales, marketing, and product development strategies."[24]

Additionally, as a high-ranking executive, Norman was privy to Payscale's confidential information, including customer-pricing models and financial reports, and was actively involved in company-wide operations across the United States.[25]

---

[20] App. to Opening Br. at A223 (Am. Compl. ¶ 50).

[21] *Id.* at A222, A224–25 (Am. Compl. ¶¶ 48, 55).

[22] *Id.* at A226–27 (Am. Compl. ¶ 59).

[23] *Id.* at A223, A227 (Am. Compl. ¶¶ 51, 60).

[24] *Id.* at A224 (Am. Compl. ¶ 54).

[25] *Id.* at A223, A226 (Am. Compl. ¶¶ 52, 58).

The amended complaint expressly alleges that the non-compete's national scope is also based upon the nature of Payscale's customers because "[m]any of Payscale's customers, particularly the Enterprise customers, operate nationwide or, at least, beyond the borders of the state in which they are headquartered."[26]

To justify the non-compete's eighteen-month duration, the amended complaint emphasizes features of Payscale's relationship with its "Enterprise" customers. Payscale states that Enterprise customers are "high-value" clients because they "typically maintain long-term relationships with Payscale, exhibit high renewal rates, and generally do not move to a new vendor frequently."[27] The typical length of an Enterprise contract is three years; Norman's non-compete is half that length: eighteen months.[28]

Given the non-compete's national scope, Payscale "must demonstrate it is protecting a particularly strong economic interest to persuade the Court that the non-compete is enforceable."[29] Payscale alleges that the non-compete's terms are directly tied to protecting specific contracts with its most valued customers; at the pleadings stage, it is reasonable to infer that protecting relationships with these key

---

[26] App. to Opening Br. at A220 (Am. Compl. ¶ 41).

[27] *Id.* at A245 (Am. Compl. ¶ 128).

[28] *Id.* at A219 (Am. Compl. ¶ 36); App. to Opening Br. at A266 (Incentive Equity Agreement § 8(a)).

[29] *See FP UC Holdings, LLC v. Hamilton*, 2020 WL 1492783, at *7 (Del. Ch. Mar. 27, 2020).

customers is in Payscale's "particularly strong economic interest."[30]   Although

discovery and a more discerning standard of review may well support the conclusion

that the non-compete is not reasonable as applied to Norman, the "reasonably

conceivable" standard that Norman and BetterComp invoked by moving to dismiss

the claims does not permit the trial court's conclusion that the non-compete's scope

and duration were facially unreasonable.[31]

---

[30] *But cf. Centurion Serv. Grp., LLC v. Wilensky*, 2023 WL 5624156, at *5 (Del. Ch. Aug. 31, 2023).  The Court of Chancery has previously emphasized that a covenant with a nationwide scope is typically upheld when it is tied to the sale of a business.  *See FP UC Holdings*, 2020 WL 1492783, at *7 ("To be sure, this court has enforced non-competes with a nationwide scope, but only in instances where the competing party agrees, in connection with the sale of a business, to stand down from competing in the relevant industry . . . anywhere . . . for a stated period of time after the sale.  These broader restrictions make sense following the sale of a business.") (citations omitted); *see also Centurion Serv. Grp.*, 2023 WL 5624156, at *5 ("These vague and everyday concerns do not demonstrate Section 5(a) is warranted by a particularly strong economic interest.").  But we have never held that there is a bright-line rule under which a non-compete with a nationwide scope is facially unenforceable outside the context of a sale of a business.

[31] Based on the facts alleged, Payscale has sufficiently pleaded a breach of the non-compete. Norman's role at BetterComp has significant geographic overlap with her role at Payscale.  Even focusing on a narrower, regional geographic scope, Payscale alleges that Norman's work in BetterComp's east region overlaps with Payscale's west region in "Indiana, Mississippi, Arkansas, and Louisiana."  App. to Opening Br. at A238 (Am. Compl. ¶ 90).  In addition, the amended complaint discusses the similarities in Norman's duties and interactions with customers.  Payscale asserts that, within ten months of leaving Payscale, Norman:

> [H]olds a senior-level sales position at BetterComp (just like she did at Payscale), manages a sales team (just like she did at Payscale), is involved in sales strategy (just like she was at Payscale), and directly and indirectly solicits customers and potential customers with 1,000 or more employees (just like she did at Payscale).

*Id.* at A237–38 (Am. Compl. ¶ 88).  It also highlights that Norman's work "pitching and selling BetterComp's flagship services . . . directly competes with Payscale's MarketPay product," which targets "Enterprise-level companies."  *Id.* at A238 (Am. Compl. ¶ 89).

12

ii.

On appeal, Norman also argues that the compensation was inadequate to support the breadth of the restrictions, emphasizing Payscale's statement that the PIUs were worth $0 at the time of issuance and may never become valuable.[32] Consideration plays two roles in the analysis of restrictive covenants: first, the court may inquire whether consideration was exchanged such that a contract was formed; and second, consideration informs the balance of equities as the court assesses the reasonableness of the restrictive covenants. Norman's argument regarding consideration conflates the formation analysis and the balancing of the equities.

In reaching its holding about the non-compete's reasonableness, the Court of Chancery relied in part on its conclusion that the consideration that Norman received was "vanishingly small" in relation to the scope of the restriction that the non-compete imposed.[33] That analysis was mistaken in two respects. First, the relative value of the consideration that an employee receives is appropriately included in the balancing of the equities, but the court did not conduct that balancing in this case.[34]

---

[32] Answering Br. at 7, 10, 23.

[33] Opening Br. Ex. A (Court of Chancery Op. at 13).

[34] *See FP UC Holdings*, 2020 WL 1492783, at *6 ("When applying this balancing test, the court should take notice of the consideration an employee received in exchange for her promise not to compete before determining whether the non-compete is reasonable.") (citations omitted).

13

Second, the court could not determine that the consideration was "vanishingly small" based on the facts pleaded in the amended complaint.

The contract-formation analysis of consideration turns on whether some consideration was exchanged at the time of contracting, not whether that consideration was "adequate" to support the accompanying restriction.[35] In *North American Fire Ultimate Holdings, LP v. Doorly*, we reversed the Court of Chancery's dismissal of an amended complaint, holding that consideration for a restrictive covenant is reviewed at the time of contracting and that "somewhat contingent" consideration, which does not hold value at the time a party seeks to enforce the contract, still constitutes consideration.[36]

That is not to suggest that the adequacy of consideration is irrelevant in the context of restrictive covenants; the balancing-of-the-equities inquiry affords the court discretion to weigh the breadth of a restrictive covenant against the consideration that supports it.[37] But pleaded facts will not always lend themselves

---

[35] *Cf. Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 764 (Del. 2022) (stating that, when analyzing contract formation, "we limit our inquiry into consideration to its existence and not whether it is fair or adequate") (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[36] *N. Am. Fire Ultimate Holdings, LP v. Doorly*, 2026 WL 274647, at *4 (Del. Feb. 3, 2026) (TABLE).

[37] The Court of Chancery did not conduct a balancing-of-the-equities analysis in its decision. As explained above, however, it considered the adequacy of the consideration within the context of the restriction's geographic and temporal scope.

14

to this balancing process, and they did not in this case.[38] Norman was granted 150,000 PIUs in the first incentive equity agreement, and she received another 25,000 PIUs under the second incentive equity agreement following her promotion.[39] The amended complaint states that the PIUs are worth $0 at the time of issuance, but it alleges that the PIUs have significant value "at the time of an event, typically a sale."[40] The parties disagree factually as to whether Norman retained her vested PIUs and the value of those units.[41] The reasonable inferences the court must draw at the pleading stage regarding the PIU's value would not support the conclusion that the equities balance against Payscale with respect to the consideration exchanged. Again, that balancing may shift on a more-developed record.

iii.

It is also reasonably conceivable that the non-compete advances Payscale's legitimate economic interests. This inquiry "focuses on whether the non-compete is

---

[38] At the pleading stage, no discovery has been conducted, and it may often be difficult for a court to determine the adequacy of contingent consideration without discovery. As such, Norman's reliance on *FP UC Holdings, LLC v. Hamilton* to support her claim regarding the inadequacy of the consideration is not persuasive. *FP UC Holdings* determined that the former employee received "token consideration" after reviewing the record submitted by the parties during its injunction proceedings. *See FP UC Holdings*, 2020 WL 1492783, at *7.

[39] App. to Opening Br. at A222 (Am. Compl. ¶¶ 46, 47).

[40] *Id.* at A228 (Am. Compl. ¶ 62).

[41] *Compare* Answering Br. at 22 (stating that Norman believes that her PIUs "were cancelled by operation of the plain terms of Section 8(e)") *with* App. to Opening Br. at A228 (Am. Compl. ¶ 61) (stating that Payscale believes that the incentive equity agreement allows Norman to "receive payment relating to the PIUs if there is a sale," except for the "125,782 unvested PIUs [that] were cancelled upon Norman's resignation").

15

'essential for the protection of the employer's economic interests,'"[42] which requires that the non-compete be tailored to protect the party's interest.[43] For a restrictive covenant, "'[l]egitimate interests' recognized by Delaware law include protection of employer goodwill[] and protection of employer confidential information from misuse."[44] In this case, the amended complaint asserts that Payscale's legitimate business interests include retaining its high-value customers and preventing competitors from usurping its business.[45] The incentive equity agreement similarly states that Topco has an interest in "protecting its Confidential Information and its Trade Secrets."[46]

The Court of Chancery dismissed Payscale's claim after finding that the non-compete provision was broader than necessary to protect these business interests. In so holding, the court focused on two things: (i) its conclusion that the non-compete effectively barred Norman from working anywhere in the world; and (ii) its view that the inclusion of Topco and other subsidiary businesses within the scope of the

---

[42] *FP UC Holdings*, 2020 WL 1492783, at *6 (citing *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998)).

[43] *See Norton Petroleum*, 1998 WL 118198, at *4 ("The scope of a restrictive covenant must be tailored to protect Norton's legitimate business interests . . . .").

[44] *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015) (citations omitted).

[45] *See, e.g.*, App. to Opening Br. at A249 (Am. Compl. ¶ 143).

[46] *Id.* at A266 (Incentive Equity Agreement § 8).

16

covenant expanded the restriction beyond Payscale's business. Both conclusions rested on inferences that the court drew against Payscale.[47]

First, the Court of Chancery's construction of the non-compete provision as having a worldwide effect elided the provision's express terms, which limits "Competitive Activity" to conduct occurring "anywhere in the United States."[48] To reach its conclusion regarding the "practical effect" of the non-compete, the court looked to the non-solicitation provision's inclusion of Topco's unnamed subsidiaries and their prospective clients.[49] As explained below, the court's objection to the inclusion of unnamed subsidiaries disregarded the amended complaint's allegations. Moreover, although the amended complaint acknowledges that some of Payscale's clients have worldwide operations,[50] there are no allegations that Topco, Payscale, or Payscale's subsidiaries conduct or plan to conduct business outside of the United States. Significantly, Norman did not defend on appeal the trial court's interpretation of the covenant's "worldwide" scope.[51]

---

[47] *See* Opening Br. Ex. A (Court of Chancery Op. at 15).

[48] App. to Opening Br. at A268 (Incentive Equity Agreement § 9).

[49] Opening Br. Ex. A (Court of Chancery Op. at 14).

[50] App. to Opening Br. at A220 (Am. Compl. ¶ 41) ("Many of Payscale's customers, particularly the Enterprise customers, operate nationwide or, at least, beyond the borders of the state in which they are headquartered. Several of Payscale's customers also operate internationally.").

[51] Answering Br. at 18–20 (describing the scope as "nationwide"), 24–28 (discussing the legitimate-interests inquiry without referencing the court's analysis of the unlimited geographic scope created by the non-solicitation clause).

Second, the court's concern about the non-compete's inclusion of Topco's unnamed subsidiaries disregarded the amended complaint's allegation that Payscale is Topco's only operating subsidiary and "[a]ll of Payscale's subsidiaries conduct the same line of business as Payscale—namely, compensation data, software, and services."[52] Given that allegation, it is reasonable to infer that the non-compete is limited to Payscale's business interests. Although Norman raises various arguments and hypotheticals to challenge whether the covenant is tailored to Payscale's business interests, those arguments would require us to draw inferences in Norman's favor, which we cannot do at this stage.[53] Payscale has sufficiently pleaded that the non-compete advances its specific, legitimate economic interests.

---

[52] App. to Opening Br. at A230–31 (Am. Compl. ¶ 67). Payscale explains that "[a]lthough the Agreements do not explicitly state what lines of business are conducted by Sonic Topco or its subsidiaries, Norman was well-aware of the type of business that would give rise to Competitive Activity under the noncompetition clause when signing the Agreements." *Id.* (Am. Compl. ¶ 67).

[53] The non-compete provision at issue also differs from those previously disfavored by the court. Norman cites *Hub Group, Inc. v. Knoll* to argue that the restrictive covenant is not narrowly tailored, but the restrictive covenant at issue in *Hub Group* included any business the company was "'actively considering or was considering' in the year 'preceding the date of the end of Employee's employment with [the company][.]'" *Hub Grp., Inc. v. Knoll*, 2024 WL 3453863, at *9 (Del. Ch. July 18, 2024), *appeal refused*, 346 A.3d 1127 (Del. 2024) ("This prohibition extends to entities not yet competing with any Hub entity but planning to conduct business one day that may compete with a Hub entity."). Such a restriction is substantially broader and vaguer than Payscale's restriction, which includes only business or proposed business "*as evidenced by a written business plan in effect prior to*" Norman's departure. App. to Opening Br. at A268 (Incentive Equity Agreement § 9) (emphasis added). And, critically, *Hub Group* was decided after expedited discovery and on the employer's motion for a preliminary injunction. *Hub Grp.*, 2024 WL 3453863, at *5.

18

Accordingly, the trial court erred in dismissing Payscale's claim that Norman breached the non-compete provision.

## 2.

The trial court dismissed Payscale's claim for breach of the non-solicitation and confidentiality provisions based on its conclusion that the allegations were pleaded on "information and belief" without any additional facts.[54] We disagree.

In the amended complaint, Payscale alleges that "BetterComp recruits Payscale employees in order to gain access to Payscale's Confidential Information and gain a competitive advantage."[55] It specifically asserts that "approximately one-

---

[54] Opening Br. Ex. A (Court of Chancery Op. at 18). The non-solicitation provision at issue states:

> (b) Nonsolicitation. Recipient agrees that, during the Protection Period, Recipient shall not, and shall cause Recipient's Affiliates not to (or to otherwise assist any other Person to), directly or indirectly (i) induce or attempt to induce any employee, advisor or independent contractor of any member of the Partnership Group to leave the employ or engagement of the Partnership Group, or in any way interfere with the relationship between any member of the Partnership Group and any of their respective employees, advisors or independent contractors, or (ii) induce or attempt to induce any client, customer, supplier, vendor, licensor, lessor or other business relation of any member of the Partnership Group (or any prospective client, customer, supplier, vendor, licensor, lessor or other business relation with which any member of the Partnership Group has entertained discussions regarding a prospective business relationship) to cease or refrain from doing business with any member of the Partnership Group, or in any way interfere with the relationship (or prospective relationship) between any such client, customer, supplier, vendor, licensor, lessor or other business relation and any member of the Partnership Group (including, but subject to Section 7(a) above, making any negative statements or communications about any member of the Partnership Group or any of their respective equity holders, directors, officers, advisors or employees).

App. to Opening Br. at A266 (Incentive Equity Agreement § 8(b)).

[55] App. to Opening Br. at A246 (Am. Compl. ¶ 133).

19

third of BetterComp's current employees are former Payscale employees."[56] Regarding its Enterprise contracts, Payscale highlights its difficulty in re-signing those clients after they contract with a competitor, stating that, "[s]ince 2018, Payscale has renewed contracts with only 283 former Enterprise customers."[57] Linking this business challenge to Norman's employment at BetterComp, Payscale alleges that "shortly after Norman began working for BetterComp, Payscale has lost at least five Enterprise customers to BetterComp, and believes that several more Enterprise customers have left Payscale for BetterComp."[58]

Those allegations are not conclusory; the loss of several Enterprise contracts within two months of Norman joining BetterComp, Norman's high-ranking position within Payscale, the challenges associated with losing high-value Enterprise customers, and the nature of BetterComp's recruiting process are particularized factual statements that support Payscale's breach claims. Without discovery, Payscale could not be expected to plead more particularized facts about its competitor's business or competitive practices.

Accordingly, the amended complaint pleads a reasonably conceivable claim that Norman may have used or disclosed confidential information to BetterComp

---

[56] *Id.* (Am. Compl. ¶ 133).

[57] *Id.* at A219 (Am. Compl. ¶ 36).

[58] *Id.* at A245 (Am. Compl. ¶ 128).

and, at a minimum, assisted BetterComp in soliciting Payscale's customers and employees. The trial court erred in dismissing it.

B.

The trial court dismissed Payscale's claim for tortious interference with contract on the basis that Payscale failed to plead a breach of contract claim in Count I. Norman conceded on appeal that Count II turns on Count I's viability.[59] Since we have held that the court erred in dismissing Count I, it follows that the Court of Chancery's dismissal of Count II also must be reversed.

IV.

Accordingly, we **REVERSE** the Court of Chancery's judgment below and **REMAND** for further proceedings consistent with this decision.

---

[59] Answering Br. at 36–37 ("Payscale's tortious interference with contract claim rises and falls with the enforceability of the Restrictive Covenants.").